Jesse E. HALL, Sr., and Rhoda O. Hall, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18247.

United States Court of Appeals
Fifth Circuit.

July 19, 1961.

---

2. Bad debt losses during the three tax years totaled only $2,553.92.

Donald P. Moyers, John H. Conway, Jr., Tulsa, Okl., Martin, Logan, Moyers, Martin & Hull, Tulsa, Okl., of counsel, for petitioners.

Charles K. Rice, Asst. Atty. Gen., Hart H. Spiegel, Chief Counsel, Rollin H. Transue, Atty., I. R. S., Washington, D. C., Lee A. Jackson and Arthur I. Gould, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The facts in this tax deficiency case are fully and carefully stated in the opinion of the Tax Court reported at 32 T. C. 390, and may be here summarized with extreme brevity. Prior to 1947 petitioner Hall was engaged, in a small way, in manufacturing equipment he had designed for the cementing of oil wells. In March of 1947 the Gulf Oil Company, convinced of the merit of petitioner's products, placed an order with him for

over $500,000 worth of equipment to be delivered in Venezuela. At that time petitioner was doing business as a sole proprietorship—Weatherford Company of Weatherford, Texas. Enormous profits were to be anticipated by the Weatherford Company from the sale of petitioner's equipment to Gulf, and from the future sales which would doubtless follow successful utilization of petitioner's devices by Gulf. For example, an item which cost $1.75 to produce sold for $28.-60, another costing $2.65 sold for $55. On July 8, 1947 there came into being the Weatherford Spring Company of Venezuela, C.A. (hereinafter called the Spring Company). On July 14, 1947 the Weatherford Company contracted for the Spring Company to act as Weatherford's sole representative and distributor for all foreign countries, including Venezuela, and to sell to the Spring Company all articles manufactured by the Weatherford Company at "cost plus ten per cent." By this device the enormous profits which would have been realized by the Weatherford Company on its foreign sales were shifted almost totally to the Venezuelan corporation.

The Commissioner has determined, and the Tax Court agreed, that it is necessary to allocate the income of the Spring Company for the years 1947 and 1948 to petitioner Hall "in order to prevent evasion of taxes or clearly to reflect [his] income." Section 45, I.R.C.1939, 26 U. S.C.A. § 45. The statute provides that income may be reallocated "in any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests * * *."

According to the Commissioner, petitioner Hall both "owned" and "con-trolled" the Spring Company within the meaning of the statute. On the question of ownership the Commissioner showed the following. From July 1947 to February 1948, of the 250 shares in the Spring Company, 248 were recorded in the name of the petitioner Hall, 1 share in the name of his son Elmer, and 1 share in the name of James E. Berry.[1] From February 1948 to August 1948, the record stock ownership was the same, except that one of petitioner Hall's shares was transferred to Juan A. Perea. From August 1948 onward, no shares were recorded in the name of petitioner Hall, 248 recorded in the name of Elmer Hall, and 1 each in the names of James E. Berry and Juan A. Perea. Petitioner Hall supplied all of the investment capital for the Spring Company ($8,000). Sales proceeds of the Spring Company were received by petitioner in Weatherford, Texas, where he had virtually free and unlimited use of the funds. Checks drawn on the Spring Company account in Weatherford, Texas, had to be countersigned by the petitioner. Hall carried the cash account of the Spring Company on his own books as an asset. The Spring Company maintained an office in petitioner's building in Weatherford, Texas. The employee of the Spring Company situated there received her general instructions from petitioner and, in fact, the petitioner on occasion told her what price to charge the ultimate purchasers on equipment that the Spring Company bought from Weatherford for sale to foreign customers.

■■■ In his attempt to counteract the effect of this overwhelming body of evidence, petitioner takes the position that the Spring Company was in fact owned 50% by his son Elmer and 50% by James E. Berry.[2] The only evidence

---

1. Hall gave the following explanation of why the stock was registered in his name. "A. At the time of forming the corporation, I suggested that the stock, due to the fact they didn't have any office, and one thing and another, that the stock be directed in my name, and I would assign it to them and I would hold it for the two of them."

2. In a suit brought against Hall in 1948, he was asked, "who are the other stock-

of this purported agreement is the oral testimony of the parties themselves. There was no writing to corroborate the existence of such an agreement. The Tax Court noted that, "We do not doubt that Berry had some interest in Spring Co. in addition to a straight salary arrangement but on the record here we have been unable to find that Berry owned one-half of the Spring Co. stock." This amounted to finding that the evidence was not sufficient to show that Berry owned a substantial interest in Spring Company, and it is an understatement to say that such a finding is not clearly erroneous. In the face of the Government's mountain of evidence of the ownership of Spring Company by petitioner, plus the presumption of correctness which accompanies determinations of the Commissioner,[3] the burden was clearly on the petitioner to come forward with some explanation if he was to avoid a reallocation under Section 45. Petitioner chose to sustain his burden by oral testimony of the parties that Berry was a 50% owner of the Spring Company. This claim was rejected and its rejection was a pure credibility determination. His chosen defense having failed, the petitioner cannot now complain that the Tax Court should have found that, even if Berry's interest in Spring Company was not 50%, it was substantial enough to avoid petitioner Hall's being properly termed the "owner" of Spring Company within the meaning of Section 45. Where in the record is there evidence on which the Tax Court could have found that Berry's interest was "substantial"? Petitioner's position was 50%. The only evidence of this was the purported oral agreement. The Tax Court found that no such agreement existed. The record is barren of any other evidence that Berry had a "substantial" interest in the Spring Company.[4]

Questions of ownership aside, we think that the finding that petitioner Hall was in "control" of the Spring Company during the tax years in question cannot be set aside as clearly erroneous. In addition to the evidence summarized above, which goes both to ownership and to control, the Commissioner is here supported by Section 29.45–1 of Regulation 111, which provides in part: "A presumption of control arises if income or deductions have been arbitrarily shifted." In this case most of the income which would have been realized by Hall as sole proprietor of the Weatherford Company was shifted to Spring Company. As evidence of "arbitrariness," the Government points to the fact that Hall had theretofore paid a 20% commission to an unrelated third party for both selling and servicing. The "cost plus 10%" agreement with Spring Company granted to that company a commission for sales and servicing in excess of 90%. Petitioner accounts for this fantastic commission being paid to the Spring Company by again referring to James E. Berry. Hall argues that Berry's services were so essential to the continuation of the business that it was necessary to give Spring Company a 90% commission on sales and to give Berry a 50% interest in the Spring Company in order to induce Berry to ally himself with Hall. This argument, farfetched on its face, borders on the incredible when one considers that the record is devoid of any evidence that Berry was in any way uniquely qualified to service Hall's equipment.[5]

holders in the corporation of Weatherford Spring Company of Venezuela," and his answer was, "I couldn't tell you."

He was also asked, "How much stock does he [Elmer] hold," and answered, "I couldn't tell you."

At the trial Elmer Hall was asked, "Can you tell me why the shares were not held in the name of you and Jim Berry if you were the owners?" His answer was, "There are [sic] reasons at that time * * * which I do not recall."

3. Commissioner of Internal Revenue v. Smith, 5 Cir., 1960, 285 F.2d 91, 95.

4. At all times during the tax years in question, one share of Spring Company stock was registered in Berry's name.

5. From the record it appears that Berry was the first man Hall approached in his effort to find a man to assist his son

As for the services which Spring Company was to render Weatherford Company in return for the 90% commission, it appears that Spring Company did not have selling or servicing facilities in any foreign country other than Venezuela. Moreover, it appears that when servicing was needed on equipment in use in Kuwait, Hall sent his son George, an employee of Weatherford Company, to service the equipment, even though Spring Company purported to be the exclusive servicing agent for all the equipment sold in foreign countries. In view of this evidence, we cannot find that the Tax Court was clearly erroneous when it held that income was arbitrarily shifted from Weatherford Company to Spring Company.[6]

We conclude that the finding that Hall was the owner or in control of Spring Company was not so clearly erroneous as to require reversal by this Court.

There is also at issue in this case the deductibility of a sum of $316,784.38 by Weatherford Company as an ordinary and necessary business expense. When the Spring Company was set up, it was agreed that all sales made subsequent to August 7, 1947 would be credited to its account. As of that date considerable equipment had already been shipped to Venezuela, but had not yet been installed. As to this equipment, Spring Company agreed to assume the responsibility for servicing it. The charge for the servicing of this equipment was $316,784.38. This figure was arrived at by taking the cost of this undelivered equipment, adding 10% of the cost figure to it, and deducting this cost plus 10% figure from the total sales price. Thus, the "servicing" fee, in effect, transferred to Spring Company the profit Spring Company would have made had it originally sold the undelivered equipment.

The Commissioner's determination of nondeductibility is presumptively correct and cannot be overcome without positive evidence that the amount claimed to be deductible is reasonable. Commissioner of Internal Revenue v. Smith, 5 Cir., 1960, 285 F.2d 91. Under the Cohan rule, Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540, the Commissioner allowed a deduction of $22,500. We sustain the decision of the Commissioner and the Tax Court on this point.

In 1948 petitioner desired to divest himself of his interest in Weatherford Company. He sold that company to the Midway Developing Company, a Puerto Rican corporation, the stock of which was owned by petitioner's sons. This transfer of assets from Weatherford Company to Midway took place in mid-September 1948. Petitioner claims that the income of Spring Company from mid-September 1948 to December 1948 should not be attributed to him because he had no interest whatever in Weatherford Company and none in Spring Company during this period. The weakness with this argument is that Midway had difficulty in qualifying to do business in Texas, and it was not until December 15, 1948 that Midway, in fact, succeeded to the control of Weatherford. The Tax Court found that, "In the interim from the sale date in September to December 15, 1948, Hall continued to operate the factory properties in Weatherford and continued to handle all domestic sales as his own." Petitioner himself reported on his income tax all domestic sales and expenses as his own up to December 15, 1948.

Elmer. Berry's name was given to Hall by the Gulf people in reply to his asking if "they knew of anyone I could get down there and train that would satisfy them". There is no evidence in the record that Hall interviewed or sought to interview anyone other than Berry. Elmer Hall testified, however, that there were "a few" other men around with experience similar to Berry's. The record also makes it clear that Berry had never "run" a well with Weatherford equipment prior to his associating with the Halls.

6. In addition to the foregoing, letters are reprinted in the findings of fact of the Tax Court which indicate that Hall was in control of Spring Company. See, e. g., 32 T.C. 390 (R. pp. 102–103).

Clearly, the petitioner did not sustain his burden before the Tax Court of disproving the facts upon which the Commissioner relied, or of showing that the Commissioner's reallocation was "unreasonable, arbitrary, or capricious." Dillard-Waltermire, Inc. v. Campbell, 5 Cir., 1958, 255 F.2d 433, 435–436. A fortiori, this Court cannot set aside the Tax Court's findings of fact as "clearly erroneous."

The decision of the Tax Court is therefore

Affirmed.

JOHN R. BROWN, Circuit Judge (concurring in part and dissenting in part).

I concur in the opinion as to the § 23 (a) (1) (A), 26 U.S.C.A. § 23(a) (1) (A) (1939 Code), item of $316,784.38. But I respectfully dissent as to the affirmance of the Tax Court's reallocation of income under § 45, 26 U.S.C.A. § 45 (1939 Code). My reasons can best be understood against a more detailed statement of the underlying transactions.

It requires 30 out of the total of 49 printed pages of the Tax Court's opinion to set out the complex facts which gave rise to this controversy. My statement must therefore be a mere capsule. Not unnatural, and perhaps unavoidable, in this type of litigation, the tax years of 1947–1948 were the subject of testimony 11 years later. By that time some people had died, others had left the business world to raise families, one was disabled from a nervous collapse, and all had to acknowledge a dimmed recollection. Despite this, it is remarkable how clear the picture is and how really free it is from credibility choices. While, as to the decisive issue of whether one of the entities was owned and controlled by the same interests, the Tax Court speaks in terms of credibility, what it does find and credit considerably changes this from the usual process under the clearly erroneous concept.

Hall, Sr. is the Taxpayer to whom the Commissioner has attributed additional income [1] of $278,124.97 for 1947 and $768,779.56 for 1948. The deficiencies of $203,560.52 and $735,502.66, if sustained, will mean that he has become liable for taxes on that income even though he never actually received the beneficial enjoyment of that money or the fruits of that income.[2] The income in dispute was treated by Taxpayer as that of a Venezuelan corporation owned by his son, Elmer, and James Berry, a non-kinsman. For a part of the year 1948, some of the income in dispute is that of a Puerto Rican corporation owned wholly by his four sons [3] to whom Taxpayer sold all of the assets of his company.

When 1948 came to a close, Hall, Sr. did not own any interest whatsoever in his former sole proprietorship. He had received approximately $78,665.62 net from the sale. There is no suggestion anywhere that the income thus allocated for tax purposes has been in someway surreptitiously set aside for his effective use or enjoyment. Obviously, that is not meant to imply that tax liability or tax accountability depends on preservation of the fruits of income held taxable. It is pertinent at the outset in making quite clear that the effect, and hence purpose, of the reallocation is to attribute large income to one who never got either the income or the fruits of it. This total record reflects that the purpose of the

1. The attributed income in 1947 is distinct from the increased tax from disallowance of the inter-company expense. That item, later discussed, does bear, of course, on the final amount of the 1947 deficiency of $203,560.52.

2. Reference to the Taxpayer includes, where appropriate, Mrs. Hall. For the year 1947 the deficiencies were separate against each in the sum of $203,560.52 as reduced by the Tax Court. For 1948 the deficiency was jointly against both.

The Tax Court disallowed fraud penalties holding "there is no indication that Hall was wilfully attempting to evade, rather than avoid, taxes. On the contrary, the record convinces us that he reported what he thought was legally due."

3. The sons were Jesse E. Hall, Jr., George, John and Elmer.

Commissioner was not to reallocate all of the income among all of the participants—here the father and his four sons and two closely held corporations. Perhaps that would have been permissible on the theory of a composite of closely allied enterprises. Here, all of the income is attributed to one only — the father — presumably on the theory that if he did not in fact get the income, he could have since he had sufficient control, and therefore what he might have pressed for had he tried, the law considers he obtained.

This all begins long before 1947. Hall, Sr. as early as 1935 had developed a "spiral centralizer" and by 1941 a "scratcher" for use in cementing oil wells.[4] As this business during the early 1940's was carried on in Weatherford, Texas, it is referred to as the Weatherford Company. Activities were limited and sales were small.[5] His sons, Jesse, Jr. and John, were working with him. The other two, Elmer and George, worked for Superior Oil Company as assistant superintendents engaged in oil well drilling. Foreign sales during 1944 and 1945 were negligible and in 1946 totaled only $8,138.

Then an event occurred which brought about a spectacular increase in business, but with it a train of serious problems. Mr. Teplitz, a chemical engineer on the research staff of Gulf Oil Corporation in Pittsburgh, was studying the vexing problems of cement completion. He learned of Hall's devices. Together they made a series of completions in wells in and offshore to Louisiana where great difficulties had been encountered. The success was startling. Teplitz and a researcher for Halliburton Oil Well Cementing Company published technical papers describing this operation. Gulf was so impressed that in late 1946 Teplitz asked Hall, Sr., to go with him to Venezuela to make test runs. These, too, were very successful, so much so that Gulf in late March 1947 initiated orders through its Venezuelan subsidiary, Mene Grande Oil Company, for its requirements for the five quarters beginning with the second quarter in 1947. These totaled $540,574.

Many problems now mushroomed. Hall, Sr. had long learned that the greatest obstacle to sales was acceptance of the devices by drillers and toolpushers in the field. They had a traditional, inveterate hostility to anything affixed to the outside of the casing. This was, to them, just one more source of losing a well. The problem was even more acute in Venezuela because of native crews, lack of communications and an unusual independence on the part of American drilling supervisors. The problem was not so much technical difficulty in the use of the devices as it was an unwillingness to use them. Hall, Sr. recognized, as Teplitz confirmed as a witness, that if business was to prosper someone had to be on the ground to "service" this equipment. To service meant primarily to get drillers to use it, and that meant being there to help and urge them to use these devices. To help solve that Hall, Sr. sent urgent words requesting Elmer to quit his job with Superior and come to Venezuela. This he did in April 1947. Hall, Sr. returned to Texas. In the meantime there were serious problems of financing and production in Texas growing out of this sudden expansion.

Then trouble hit. With commitments made for plant and inventory expansion, considerable production already complet-

4. These were affixed to the outside of the oil well casing. The centralizer was to hold the drilling casing in the center of the hole during cementing. The scratcher, used in conjunction with reciprocating, (i. e., raising and lowering) the casing cleaned the adjacent surface of the sidewall to free it from drilling mud, etc. The problem is to get the cement to form a solid sheet. Where the bond is imperfect there is a possibility of leakage between formations, oil sometimes escapes to the surface through the annulus between the casing and the wall, and blowouts or other serious complications can result.

5. Sales grew from $17,000 in 1942 to $238,000 in 1946.

-ed and shipped or awaiting shipment to Venezuela and a greater amount of production underway for ultimate delivery to Venezuela, Gulf called an urgent conference in Pittsburgh in June 1947. Complaints from the field were the precipitant. The buyer ultimatum was plain—either eliminate the problem or Gulf would cancel all orders unfilled and would return devices not yet used. The obvious solution to this critical problem was closer "supervising" in the field.[6] It was evident that Smith[7] could not supply it and it would take more than Elmer's presence. Hall, Sr. knew that he could not continue his fast itinerant pace between Texas and Venezuela. There was general consensus that a strong position had to be developed in Venezuela. Hall, Sr., moving swiftly, returned again to Venezuela. There he and Elmer contacted James Berry. Berry, then a drilling superintendent for one of Shell's affiliates, had been recommended by Gulf as the type of production man needed to get the kinks out of this business. Berry had just recently determined that he would leave the security of corporate employment and get into oil well production activities there or in the states on a proprietary basis. His resignation, already tendered to Shell, was to take effect in September 1947. In discussions with the Halls, he showed interest in becoming associated with them. However he emphatically rejected all propositions based on salary only. He demanded an ownership interest.

No one doubts that these demands were made. No one asserts they were unreasonable. Hall, Sr. facing certain business disaster not only as to Venezuela but in his entire operations, had a direct, immediate and imperative interest. Any cost inherent in this solution could hardly be looked on as a gift by him. It had actual business, as well as legal, considerations. The agreement made was that a Venezuelan corporation would be formed. It would be the exclusive agency for world-wide foreign sales including Venezuela.[8] Manufacturing would be done by Weatherford Company in Texas. It would sell to Venezuela Spring at cost plus 10%. Venezuela Spring would in turn sell to foreign customers at a price schedule comparable to that maintained by Weatherford Company for its domestic customers. Venezuela Spring would be responsible for all such sales, the servicing, and the replacement of the equipment sold.

Venezuela Spring[9] was incorporated and the sales agreement, briefly outlined, was signed. The capital account of 25,000 Bolivars ($8,000 U.S.A.) was furnished by Hall, Sr. This he had agreed to do as one of the inducements to Berry. Elmer was President and Berry was Vice President. It is at this point that, as I see it, we approach the crucial issue: was Venezuela Spring owned by Elmer and Berry? Or was it owned substantially by Hall, Sr.?

The formal corporate records, extremely meager as they were, were kept by the Venezuelan lawyer. On the stock book, the stock was shown as issued for the number of shares and in the names of Hall, Sr. (248), Elmer (1) and Berry (1). In August 1948, the record showed Hall, Sr. (0), Elmer (248), Berry (1), and a local Venezuelan (1). Hall, Sr. testified that he was not to have, and

6. As a result of the pending disaster Hall, Sr. had Weatherford stop production until these practical problems were worked out. There is no basis for the implication that this was a cessation merely to permit Venezuela Spring to take over the business.

7. Weatherford Spring had an export sales contract with Smith calling for 20% commission. Smith's contract was terminated in October 1947 by Weatherford

Spring for failure to perform needed services. Litigation resulted.

8. Hall, Sr. was primarily an inventor. He had 21 American patents and two foreign patents, all relating to oil well operations. An important part of the agreement was a license of all of his patents covering the devices to be sold.

9. Weatherford Spring Company of Venezuela, C. A., was incorporated July 8, 1947.

did not own, any interest in Venezuela Spring. Berry and Elmer were equally positive that it was owned by the two of them alone. All three established that only in this way could Berry's prerequisite of proprietary interest be satisfied. None considered the formal apparent record ownership either at variance with the agreement or of any material importance. The only uncertainty was the proportion as between Elmer and Berry. Berry described this as 50/50 to begin with subject to any later adjustment between the two. The adjustment, he said, referred to the possibility of appropriate alteration if either of them later withdrew from personal active management in Venezuela.[10]

Of course, whether the ownership is real or merely apparent is a classic fact issue where the claim and the record are at such variance. Had the Tax Court treated this in a way reflecting that it had made credibility choices rejecting the claim of substantial stock ownership by Berry, I would not, in the circumstances of this record, be free to say that this was clearly erroneous.

But this is not what the Tax Court held. It credited altogether the basic thesis that Berry had, and had to have, an ownership interest in Venezuela Spring. The Court said, "We do not doubt that Berry had some interest in [Venezuela] Spring Co. in addition to a straight salary arrangement * * *." Of course if he had "*some* interest," there was no basis whatsoever in this record for finding it something less than substantial. But the Tax Court seemed preoccupied with whether the split was 50/50. For it continued the words quoted above by saying, "but on the record here we have been unable to find that Berry owned one-half of the [Venezuela] Spring Co. stock." The Court's repeated finding that "Considering all the evidence in the record, we have been unable to find that during the taxable years the stock of [Venezuela] Spring Co. was owned one-half by Elmer and one-half by

Berry" was far from a holding that Berry had no substantial stock ownership.

It did not even purport to state that Hall, Sr., not Elmer and Berry, was the owner. More than that, impliedly crediting the testimony and claim of all three that Berry had a substantial stock ownership, what followed demonstrates that the Tax Court's ultimate decision cannot fairly be regarded as based upon a credibility choice on this aspect. That issue seems to have been looked upon as immaterial for the Court continued, "However, regardless of the question of the ownership of the [Venezuela] Spring Co. stock, we think the record is abundantly clear that Hall controlled [Venezuela] Spring Co. during the taxable years."

Once this record compels, cf. Riedel v. Commissioner, 5 Cir., 1958, 261 F.2d 371; United States v. Leveson, 5 Cir., 1959, 262 F.2d 659; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709, as it does, the positive conclusion that Berry had a substantial stock ownership approaching at least the 50% mark, that conclusion has a very important bearing on reallocation. I do not, of course, mean to saddle the § 45 broad grant of a fact-supported discretion with refinements based on technical differences in the percentages of ownership in allied enterprise having common ownership and control. The cases and the regulations do not depend on percentages as such. See Grenada Industries, Inc. v. Commissioner, 5 Cir., 1953, 202 F.2d 873, certiorari denied, 346 U.S. 819, 74 S.Ct. 32, 98 L. Ed. 345; Dillard-Waltermire, Inc. v. Campbell, 5 Cir., 1958, 255 F.2d 433; Raymond Pearson Motor Co. v. Commissioner, 5 Cir., 1957, 246 F.2d 509; Tennessee Life Ins. Co. v. Phinney, 5 Cir., 1960, 280 F.2d 38. The element of control is spelled out in the regulations to include "any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. * * *." Since it "* * * is the reality of the control which is de-

10. Elmer later did this and between him and Berry, the percentage was revised to 40/60.

cisive, not its form or the mode of its exercise." § 45–1(a) (3) Regulations 111. But it must not be overlooked that this wide power of reallocation is confined to those businesses which are "owned or controlled * * * by the *same* interests * * *," 26 U.S.C.A. § 45. A substantial difference in the real, actual ownership will not satisfy the requirement of the "same interests." 7 Merten, Law of Federal Income Taxation § 38.62 at 123.

The statutory objective of reallocation "to reflect the income" of any such business or to "prevent evasion of taxes" rests on the economic reality that it is one enterprise in which a group of persons, or legal entities, or combinations of them, reap the enjoyable fruits of the whole activity. Consequently, it is appropriate to treat the total earnings as a whole. But this envisages that a unit of the enterprise to whom income is attributed by reallocation was entitled to participate in and enjoy the beneficial use of that income. It cannot attribute to such unit income which was clearly for the beneficial use of another. Raymond Pearson Motor Co. v. Commissioner, supra, at page 516 of 246 F.2d; Friedlander Corp. v. Commissioner, 5 Cir., 1954, 216 F.2d 757, 759, reversing Tax Court, 19 T.C. 1197.

As an illustration in relation to this record, if Venezuela Spring, by means of the favorable cost-plus 10% purchase price, was a mere conduit through which to channel all profits back to Hall, Sr.—or for that matter to his family, including Elmer—a reallocation would satisfy one of the principal purposes of the statute. Asiatic Petroleum Co. v. Commissioner, 2 Cir., 1935, 79 F.2d 234, certiorari denied, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459. But what Berry owned, what Berry was entitled to enjoy, may not be taken from him. Unless it is taken from him, there is, at least as to his rightful share, nothing to attribute.

Once Berry's substantial ownership in Venezuela Spring is given effective recognition, the other evidentiary facts which the Tax Court thought indicative of control become less significant. The maintenance of one of Venezuela Spring's bank accounts in Texas was not a suspicious circumstance. The record shows that during 1948 an accountant undertaking to establish a more adequate set of records went from Texas to Venezuela. He departed suddenly with the onset of a revolution. The security of a bank account in the United States did not have to be purchased at the price of reallocation. Communications were impossible in Venezuela, and it was quite appropriate that someone in the States have authority to draw on this account. By bank signature cards this was accorded to Venezuela Spring's accountant-bookkeeper with a countersignature of Hall, Sr. Substantial sums of money were involved, and it does not show abdication by Venezuela Spring for its management to determine that Hall, Sr. was a reliable person. Likewise, the agreement which permitted Weatherford Company to use these Texas deposited funds of Venezuela Spring served an existing business purpose of vital interest to it. Records were carefully kept and funds so used were treated as notes payable by Hall, Sr. Indeed, as we shall later see, when Hall, Sr. sold his entire ownership in Weatherford Company to a corporation owned solely by his four sons, the proceeds received in that sale were used to repay the balance due on such advances. The other details, most of them quite trivial or personal in nature, when tested now against the background of a substantial ownership by Berry amount to nothing more than the natural dependence of Elmer, the son, upon the judgment and wisdom of his father.

On the other side of the coin there is the undisputed fact that Venezuela Spring had a direct employee located in a separate office at Weatherford. This employee was responsible for processing all orders for Venezuela shipments, and the keeping of books on a receipts and disbursement basis for Venezuela Spring. There can be no doubt that Elmer and Berry were active. They were the sole active management of all operations in

Venezuela and each of them came to the States on more than one occasion on important missions for Venezuela Spring.

Since I would hold that for this basic reason the adjusted profit from the foreign sales made by Venezuela Spring may not be attributed by reallocation to Hall, Sr., there is no longer any question about the agreed price of cost-plus 10% payable by Venezuela Spring to Weatherford Company. This was part of the agreement to induce Berry to forsake his other tentative plans and join in this enterprise. The costs which were used are not attacked as arbitrary or unfounded. The record is uncontradicted that detailed cost studies were undertaken in the plant. It was these costs which were used in the billing by Weatherford to Venezuela Spring. The criticism of the Commissioner was not that these costs were inadequate in the sense that they were noncompensatory for the manufacturing process. On the contrary, as the books and the income tax returns of Weatherford Company bore out, there was taxable net income from manufacturing operations. The complaint is that the discount to Venezuela Spring was too large which enabled Venezuela Spring to make a greater profit than it ought to have been able to make. But a taxpayer may not be taxed for profits he ought to have made had he exercised better business judgment and charged more for his product. To be sure, between controlled companies owned by the same interests, this may be subject to reallocation or readjustment. But, as I have said, this is not available here. We are dealing here only with income and unless there is a basis for attributing profits made by Venezuela Spring from this extraordinarily favorable purchasing price, the matter is no longer one for review as to reasonableness.

It follows, therefore, that with respect to the years 1947 and 1948 the income attributed to Hall, Sr. by virtue of the adjusted profits made ostensibly by Venezuela Spring for these foreign sales I think should be set aside.[11] As this conclusion would rest on a basic holding, the result would apply to the whole of 1948 without regard to the sale of Weatherford Company by Hall, Sr. to a Puerto Rican corporation, Midway Developing Company of Puerto Rico, in September 1948. I arrive at the same result even though we treat that as a mere continuation by Hall, Sr. But as pointed out earlier, this transaction is pertinent in showing an absence of beneficial ownership of income by Hall, Sr. in Venezuela Spring's profits.

The facts on the Midway transaction are very simple. In 1948 Hall, Sr. became more and more weary of management responsibilities in the manufacturing and sales fields. He wanted to get back to inventing. He desired to turn over to his four sons his entire Weatherford Company operations. Rather than make a gift, this was to be handled as a sale. The sale was to be made of all assets at depreciated book value. This amounted to $520,450. As a part of this transaction, however, Hall, Sr. desired to pay off the entire indebtedness he owed to Venezuela Spring. This totaled $441,-784.38. This was primarily made up of the charge of $316,784.38 involved in the § 23(a) (1) (A) issue discussed in the Court's opinion. This also included the balance of notes payable for funds of Venezuela Spring used by Weatherford Company.[12] The purchasing corporation

11. Without undertaking to make the recomputations which would be for the Tax Court on remand, these are the items discussed by the Tax Court as follows: for the year 1947, adjustment (b) increasing income as to each of the two taxpayers $278,124.96; for the year 1948, adjustment (a) increasing income by $768,779.56.

12. In addition to the $316,784.38 item, the indebtedness comprised $38,628.20 for office furniture and machinery transferred from Venezuela Spring to Weatherford and loans payable $86,371.80.

was the Midway Developing Company, a Puerto Rican corporation, the stock of which was owned by all four sons. Midway borrowed from Venezuela Spring [13] a total of $458,000. It in turn paid to Hall, Sr. the sum of $520,450. To secure repayment of the money loaned by Venezuela Spring (and affiliate) Midway gave its notes and mortgages.

The result was that after paying off his indebtedness to Venezuela Spring, Hall, Sr., received $78,665.62 net.[14] After the sale, Hall, Sr. had no interest whatsoever in Weatherford Company,[15] and he had had none in Venezuela Spring.[16]

Attributing all of Venezuela Spring's profits (as adjusted) to Hall, Sr. even though after mid-September 1948 he had no ownership graphically manifests how the element of ownership by the same interests has been entirely disregarded by the Tax Court. There was nothing illegal or immoral about a father desiring to transfer a thriving business to his sons. The method of a sale was legitimate. No question is raised about the amount paid or the genuineness of the transfer as a completed irrevocable act. The method of financing was plausible. The sons through their wholly owned corporation, Midway, now became the debtor (in the stead of Hall, Sr.) to Venezuela Spring. Venezuela Spring was amply secured by mortgages on the plant manufacturing the product which enabled it to make profits. Unless this whole transaction was rejected as a sham—which the Tax Court did not even purport to do—attributions of income to Hall, Sr. rest altogether on some notion of continued *control*. But control without ownership of any kind, with no right to participate, directly or indirectly, in the fruits of income, does not permit allocation and thereby the imposition of severe tax burdens on one who will not, and cannot, get any income benefit.

So whether Midway is treated as a mere *continuation* or as a new and independent successor-sole-owner, there is no basis for attributing this 1948 income to Hall, Sr.

As to the § 45 reallocation, I therefore dissent.

13. This was made up of sums furnished by it and the new Venezuelan affiliate, Hall Development Company of Venezuela, C. A., formed in August 1948. This corporation was to hold the licensing rights that Venezuela Spring had in the patents and to own warehouses for inventory. Its primary purpose was to insulate assets, cash, patents, licenses and inventories from potential damage claims due to the risks of cementing operations.

14. As we sustain the Tax Court's disallowance of the § 23(a) (1) (A) item of $316,784.38, it now turns out that the sale actually represented a loss of $238,118.76.

15. While Weatherford Company assets were transferred to Midway about mid-September 1948, difficulties were encountered in qualifying that foreign corporation to do business in Texas. On advice of his accountants, Hall, Sr. treated income from domestic sales from that time to December 15, 1948, as his own. The Commissioner did not complain of this.

16. While the year 1949 is not involved directly, the Commissioner has allowed a loss carry back from the year 1949 in the sum of $33,472.85 indicating that subsequent to the years 1947 and 1948, it is not contended that Hall, Sr. has any ownership or control over the activities or income of those entities.