WOODWARD GOVERNOR COMPANY, AN ILLINOIS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1317–68.   Filed October 19, 1970.

*Lajos Schmidt* and *Robert H. Aland,* for the petitioner.
*Seymour I. Sherman,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in the petitioner's income tax for its taxable year ended September 30, 1963, in the amount of $146,333.49. One of the issues in this case has been settled. The remaining question to be decided is whether the respondent was authorized under section 482 of the Internal Revenue

Code of 1954 [1] to allocate to the petitioner certain income which the parties treated as earned by its subsidiary, Woodward Governor GmbH.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner is an Illinois corporation, which had its principal office and place of business in Rockford, Ill., at the time its petition was filed in this case. It filed its Federal income tax return for its taxable year ending September 30, 1963, using the accrual method of accounting, with the district director of internal revenue, Chicago, Ill.

The petitioner is engaged in the manufacture of prime mover controls, also known as governors, for various types of power units. These controls are divided into three separate product lines: (1) General aircraft (gas turbine and propellor) controls; (2) industrial engine (diesel and gas) and industrial turbine (steam and gas) controls; and (3) hydraulic turbine controls. The manufacture and proper installation and use of its products in power units, particularly of the more complex type such as aircraft engines, require considerable technical and engineering sophistication and know-how.

In addition to its main manufacturing facilities at Rockford, Ill., the petitioner had manufacturing plants in Fort Collins, Colo.; Slough, England; Schiphol, the Netherlands; and Tokyo, Japan. The Schiphol, Slough, and Tokyo plants began operations in 1955, 1958, and 1961, respectively. All three foreign plants had assembly, testing, and service facilities, as well as limited machine shop capabilities. The products manufactured in the Schiphol and Slough plants were sold primarily throughout Europe and were for use on industrial engines and turbines, and the products manufactured in the Tokyo plant were sold principally to diesel engine builders in Japan.

The net pretax profit earned by the petitioner for 1963 as a percentage of its total sales was 13.5 percent. The net pretax profit earned by the petitioner's Aircraft Controls Division for 1963 as a percentage of its total sales was 17.6 percent.

*The NATO Starfighter Program*

Prior to 1959, the Lockheed Aircraft Corp. (Lockheed) developed a fighter-interceptor bomber known as the F104 Starfighter (the Starfighter). The Starfighter was selected by the North Atlantic Treaty Organization (NATO) for use in the development and maintenance

---

[1] All statutory references are to the Internal Revenue Code of 1954.

of its military potential. Thereafter, NATO initiated a program under which production of the Starfighter airframe (excluding the powerplant and its parts and accessories) was licensed by Lockheed to various construction firms in West Germany, the Netherlands, Belgium, and Italy. At approximately the same time, Lockheed granted similar licenses in Japan and Canada.

The Starfighter was powered by an engine developed by the General Electric Co. (GE) and designated by GE as the J–79 gas turbine engine (the J–79 engine). Production of the J–79 engine was licensed by GE to various firms in West Germany, Belgium, Italy, Japan, and Canada. The J–79 engines manufactured by such firms were incorporated into the Starfighter airframes.

### Development and Selection of the 1307

In 1952, the petitioner began to develop the Type 1307 main fuel control (the 1307) for use in aircraft gas turbine engines. The 1307 is an extremely sophisticated and complex fuel control. Its function is to control the flow of fuel to the aircraft gas turbine engine under all conditions of altitude, attitude, temperature, acceleration, deceleration, and steady speed.

On January 7, 1955, the 1307 was selected by GE as the alternate main fuel control for use in the J–79 engine. At that time, the primary main fuel control was manufactured by the Bendix Corp. (Bendix). In 1957, the 1307 was selected by GE as the primary main fuel control to be used in its J–79 engine and thus replaced the fuel control manufactured by Bendix as the primary fuel control.

### Petitioner's General Pricing Policy and Procedure

The petitioner's first step in arriving at a list price for a product in production quantities is to determine the total manufacturing cost of the product according to its internal cost-accounting procedures. After the total manufacturing costs of the product is determined, the petitioner's next step is to arrive at a net price for the product by adding a profit margin to its total manufacturing cost. Many factors are considered in determining the profit margin, including the market potential, the risk involved, and special circumstances (e.g., special tooling, special test equipment). The net price is used by the petitioner as the selling price when there is only one customer for the product.

When there are several classes of customers, the petitioner determines a list price and the appropriate discounts from list price to be allowed to its customers for the product. These discounts are based upon the petitioner's analysis of industry practices and vary as be-

tween the petitioner's different product lines. For example, the largest or prime discount allowed by the petitioner in its industrial engine and turbine product line is 35 percent, whereas the prime discount allowed by the petitioner in its aircraft product line is 50 percent. Within each product line, the discounts vary according to customer classification, with the prime discounts allowed to so-called "original equipment manufacturers."

The final step in arriving at the list price of the product is to add to the net price an appropriate markup so that sales at the list price less prime discount will yield the net price. For example, in the industrial engine and turbine product line in which the petitioner's prime discount is 35 percent, the list price is determined by dividing the net price by 65, the complement of the prime discount, and multiplying by 100. Similarly, in the aircraft produced line in which the prime discount is 50 percent, the list price is determined by dividing the net price by 50, and multiplying by 100.

### Sales of 1307's to GE

The petitioner's first sales of 1307's to GE were of prototype units. The petitioner began to sell 1307's to GE in production quantities in 1957 after GE had selected the 1307 as the primary main fuel control for the J–79 engine, and these sales continued throughout the taxable year in issue and thereafter on a regular and continuing basis.

The petitioner's initial sales of 1307's in production quantities to GE were at net prices, which included the total manufacturing cost thereof plus a profit margin. However, prior to 1961, the petitioner developed a list price for the 1307, and in accordance with its general pricing policy, established discounts for the different classes of customers. According to this policy, the 1307's were sold to domestic original equipment manufacturers, and to the U.S. Government, at list price less a 50-percent discount; to foreign manufacturers and foreign governments, at list price less a 35-percent discount; to certain distributors and repair shops, at list price less a 25-percent discount; and to ultimate consumers, at the full list price. Since the establishment of the list price for the 1307's, all sales of such controls to GE have been at the list price less a 50-percent discount.

In accordance with its general overall pricing policy of allowing no quantity discounts, the petitioner's allowance of a 50-percent discount from list price to GE for 1307's was not based on the volume or prospective volume of 1307 sales to GE. All 1307's sold to GE were priced f.o.b. Rockford, Ill. The petitioner's trademark was affixed to all 1307's sold to GE. In connection with its sales of 1307's to GE, the

petitioner required GE to indemnify it against all liability arising from the testing or use of 1307's.

The total volume of the petitioner's sales to GE in the taxable year in issue was $12,349,000, of which $11,158,000 consisted of sales of 1307's. During such taxable year, 75 percent of the profits of the aircraft product line division was derived from the sale of 1307's to GE; some of the sales of that division during that year were of development products on which there was little or no profit.

The petitioner was not controlled, directly or indirectly, by GE; nor was GE controlled, directly or indirectly, by the petitioner.

### Sales and Service of 1307's by GE

Beginning in 1957, GE offered for sale and sold all parts and accessories for the J–79 engine, including 1307's, to those firms licensed to produce the J–79 engine. However, GE's license agreements with its licensees did not require the licensees to purchase the parts and accessories from it.

GE performed extensive selling activities through its sales apparatus with regard to parts and accessories for the J–79 engine, including 1307's. GE provided warranties against defects in materials and workmanship for all 1307's sold by it.

### Aircraft Sales to Other Customers

Canada required that a certain percentage of the components of J–79 engines manufactured by Orenda Engines Ltd., GE's Canadian licensee, had to be manufactured in Canada. The petitioner considered itself obligated to support GE's J–79 program in Canada by making it possible for 1307's to be manufactured to the required extent in Canada. For that reason, on December 2, 1959, the petitioner entered into a technical assistance agreement with Aviation Electric Ltd. (AEL), an unrelated Canadian subsidiary of Bendix. Under this agreement, the petitioner agreed (1) to sell to AEL certain 1307 parts or components and (2) to furnish AEL with the manufacturing know-how necessary to enable AEL to manufacture 1307's and certain spare parts therefor in its plant in Canada for use on Canadian-built J–79 engines for Canadian-built Starfighters. The agreement also provided that the petitioner would receive a royalty for its know-how and that it would sell the parts and components to AEL at list less a 50-percent discount.

The petitioner sold other products in its aircraft product line to other original equipment manufacturers at list price less a 50-percent discount or at net prices which were the equivalent of list price less a

50-percent discount in accordance with its standard pricing policy. For example, the petitioner sold propellor governors and related equipment to Cessna Aircraft Co., Beech Aircraft Corp., and Piper Aircraft Corp. at list price less a 50-percent discount. The petitioner also sold propellor governors and related equipment to the Hamilton Standard Division of United Aircraft Corp. and gas turbine fuel controls to Westinghouse Eelctric Corp. at net prices which were equal to list price less a 50-percent discount.

### Formation of GmbH

Prior to April 22, 1961, the petitioner made no sales of 1307's directly to GE's European licensees for the J–79 engine. All sales of 1307's had been made directly to GE, which, in turn, resold them to its J–79 licensees.

In 1961, the petitioner decided to enter into the European market for its 1307 controls through a wholly owned foreign subsidiary. Accordingly, on April 22, 1961, the petitioner organized Woodward Governor GmbH (GmbH) under the laws of the Swiss Confederation as a wholly owned subsidiary. GmbH's domicile was in Lucerne, Switzerland. The petitioner's initial investment for all quotas (equivalent to shares of stock in a domestic corporation) in GmbH was $23,255.81.

### Operations of GmbH

Following its formation, GmbH (1) purchased 1307's from the petitioner for resale to GE's European licensees for the J–79 engine, and (2) sold in Europe, the Middle East, and Africa, on a commission basis, industrial engine and turbine controls manufactured in the petitioner's United States, Slough, and Schiphol plants. Prior to the formation of GmbH, the sales of the industrial engine and turbine controls were performed by employees of the petitioner's Slough and Schiphol plants.

GmbH reimbursed the petitioner for any accounting services and other services that may have been performed on its behalf by the petitioner.

### Sales of 1307's to GmbH

Following the formation of GmbH, the petitioner decided to sell 1307's to GmbH at list price less a 50-percent discount, the same price at which they were sold to GE.

The petitioner began selling 1307's to GmbH shortly after the formation of GmbH, and these sales continued throughout the taxable year in issue and thereafter on a regular and continuing basis. The terms and conditions of the petitioner's sales of 1307's to GmbH were

the same as the terms and conditions of its sales of 1307's to GE. The petitioner's trademark was affixed to all 1307's sold to and by GmbH.

At the time of GmbH's formation, the petitioner also had to decide upon a commission rate to be paid to GmbH with regard to sales of industrial engine and turbine controls consummated as a result of GmbH's selling activities. The petitioner decided that a commission equal to 6 percent of the net selling price of such controls represented a fair compensation to GmbH for its selling activities. This conclusion was based on the selling expenses with regard to similar sales in the United States, which slightly exceeded 5 percent of the net sales price of these products.

### Sales and Service of 1307's by GmbH

Having purchased 1307's from the petitioner at list price less a 50-percent discount, GmbH offered 1307's for sale to GE's European licensees for the J–79 engine at the petitioner's list price less a discount of approximately 35 percent.

GmbH performed sales and service activities with regard to 1307's. These activities included personal visits to customers and potential customers; assistance in setting up test stands for 1307's for customers; training of customers' technicians as to overhauling, operating, and servicing 1307's; advising customers as to the types of spare parts inventories they should keep; advising customers as to the types of tools they needed; answering trouble-shooting calls; providing training films and cutaway governors; and performing crash investigations involving Starfighter aircraft.

GmbH and GE were in direct competition with each other for the sale of 1307's to GE's licensees in Europe. For example, GmbH attempted to make sales to the J–79 licensees of GE who were buying 1307's from GE. Similarly, GE attempted to sell 1307's to GmbH's principal customer for 1307's.

The first order received by GmbH was for seventy-three 1307's from Fabrique Nationale d'Armes de Guerre, S. A. (Fabrique Nationale), Belgium, a licensee of GE for the J–79 engine. This order was received by GmbH from Fabrique Nationale in May 1961, approximately 1 month after GmbH was organized. The negotiations with Fabrique Nationale with regard to this order took place prior to the formation of GmbH and were carried out by W. J. Whitehead, who at that time was the petitioner's vice president in charge of foreign operations. Mr. Whitehead advised Fabrique Nationale that it was the petitioner's intention to form a European subsidiary to handle all European sales of 1307's. Fabrique Nationale's order for the seventy-three 1307's was accepted and completed by GmbH. Delivery of such controls was

scheduled for 1962, prior to the beginning of the taxable year in issue. Fabrique Nationale was GmbH's principal customer for 1307's from the time of its formation throughout the taxable year in issue.

During the taxable year in issue, GmbH negotiated the conditions of sale, price, delivery date, and other terms of sale with regard to 1307's sold by it. All purchase orders for 1307's obtained through the sales efforts of GmbH were accepted by GmbH itself. GmbH passed title to, and assumed full risk of loss for, all 1307's sold by it, and it provided its customers with warranties against defects in materials and workmanship. GmbH assumed sole responsibility for patent infringement suits against GmbH or the petitioner arising out of sales of 1307's by GmbH and agreed to indemnify the petitioner against all liability arising from the testing or use of 1307's.

Subsequent to 1963, GmbH sold 1307's to Mitsui in Japan, but the record does not reveal the circumstances surrounding the sales and service of such controls.

GmbH provided no postsales service or warranties with respect to its sales of nonaircraft controls as the agent of the petitioner.

Set forth below is an income statement for GmbH for its fiscal year ending September 30, 1963:

| | |
|---|---:|
| Sales (type 1307 fuel controls) | $1, 868, 446 |
| Less: Cost of sales | 1, 470, 554 |
| | 397, 892 |
| Sales commissions on diesel governors: | |
| 6% of $1,037,146 | 62, 229 |
| | 460, 121 |
| Selling, service, and administrative expenses | 122, 219 |
| | 337, 902 |
| Miscellaneous income | 0 |
| Net income | 337, 902 |

#### OPINION

The issue for decision is whether the respondent was authorized under section 482 to reallocate certain income from GmbH to its parent company, the petitioner.

Section 482 provides:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests,

the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The purpose of section 482, as interpreted by the respondent, is set forth in section 1.482–1(b) (1) of the Income Tax Regulations:

(b) *Scope and purpose.* (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

See *Local Finance Corporation* v. *Commissioner*, 407 F. 2d 629 (C.A. 7, 1969), affirming 48 T.C. 773 (1967). The petitioner invites us to hold that regulation invalid and to apply a test other than the arm's-length standard. However, in view of our conclusions in the case, it is unnecessary for us to deal with that argument—we shall apply the arm's-length standard.

In situations involving sales of tangible property between members of the same controlled group, three specific pricing methods are provided by the regulations to determine arm's-length price: The comparable uncontrolled price method; the resale price method; and the cost plus method. Sec. 1.482–2(e) (1) (ii), Income Tax Regs. If comparable uncontrolled sales exist, the regulations provide that the comparable uncontrolled price method must be utilized in determining the arm's-length price, "because it is the method likely to result in the most accurate estimate of an arm's length price." Sec. 1.482–2(e) (1) (ii). If no comparable uncontrolled sales exist, the resale price method must be used, if applicable, since it is considered more desirable than the cost plus method. Finally, if the resale price method is not applicable, the cost plus method must be used. If none of the three tests can reasonably be applied, "some [other] appropriate method of pricing * * * can be used." Sec. 1.482–2(e) (1) (iii).

The respondent takes the position that the sales to GE were not comparable to, and did not establish an arm's-length price for, the

sales to GmbH. He determined that in connection with the sales of the 1307's, GmbH acted merely as a commission agent, although he recognizes that it should receive a larger commission in connection with such sales than it received for its sales of the industrial engine and turbine controls. In his determination, he recomputed the income of GmbH by allowing it a 7-percent commission on such sales, and he reallocated to the petitioner the balance of the income shown by GmbH in connection with its sales of 1307's.

Section 482, by its terms, gives the respondent unlimited authority to reallocate income and other items when necessary to prevent tax evasion or to reflect income clearly. When his reallocation is challenged, the courts have upheld his action unless it is shown that he acted arbitrarily, unreasonably, or without justification. *Ballentine Motor Co.* v. *Commissioner*, 321 F. 2d 796 (C.A. 4, 1963), affirming 39 T.C. 348 (1962); *Hall* v. *Commissioner*, 294 F. 2d 82 (C.A. 5, 1961), affirming 32 T.C. 390 (1959); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953). However, his action will not be upheld when it is found that there is no rational justification for such action. *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964).

From the record before us, we have concluded that the evidence does not support the respondent's determination. The respondent claims to have applied the resale price method described in section 1.482–2(e)(3) of the Income Tax Regulations; he refers to the provision in subdivision (vii) thereof indicating that the method may be applied when the reseller performs services similar to those of a sales agent. However, he takes that provision out of context. It is clear that the resale price method described in the regulations is not applicable to this situation. The objective of that pricing method is to determine the arm's-length price for controlled sales to a person who resells the product by reducing the resale price by the markup earned by resellers in uncontrolled purchases and sales. The method can only be applied when there are uncontrolled purchases and resales by the same reseller or a similar reseller. Similarly, although the method can be applied when the reseller is acting merely as a sales agent who receives a commission for its services, the commission must be established by reference to uncontrolled transactions. In this case, the respondent based his determination on the commissions charged by GmbH for its sales of industrial engine and turbine controls, but those sales did not involve uncontrolled transactions. The commissions were established by the petitioner, which controlled GmbH, and therefore, they do not provide a basis for applying the resale price method.

Even more importantly, the activities of GmbH in connection with the sales of the industrial engine and turbine controls and the sales of

the 1307's were significantly different. In its sales of 1307's, GmbH took title to the controls and in turn sold them to the engine manufacturers. Accordingly, GmbH assumed the warranties of a seller and incurred the credit risks. In addition, by its contract with the petitioner, it undertook to indemnify the petitioner against any tort liability. It also incurred the responsibility of furnishing services subsequent to the sale of the 1307's. The respondent points out that the petitioner, not GmbH, arranged for the first sale of the 1307's to Fabrique Nationale and questions whether GmbH performed the selling and servicing activities in connection with the sales of 1307's to Mitsui. However, the initial sale to Fabrique Nationale occurred prior to the beginning of the taxable year in issue, and the sales to Mitsui occurred subsequent to such year. Whether the price charged GmbH for those sales was an arm's-length price is not in issue in this case. Moreover, although the respondent has raised some doubts in connection with the sales to Mitsui, there is no evidence that GmbH did not perform the customary selling and servicing activities.

In view of the very significant differences between the nature and extent of GmbH's responsibilities in connection with the sales of the industrial engine and turbine controls and the sales of the 1307's, we find and hold that the respondent acted unreasonably and without justification in his determination.

On the other hand, the petitioner has convinced us that the comparable-price method is applicable in this case and that its sales of 1307's to GE established an arm's-length price for its sales to GmbH. When the petitioner decided to enter the European market for 1307's, it was not oblivious of the fact that it could thereby earn and retain a greater profit on the sale of such controls. The profit earned by GmbH was, after all, the profit of the petitioner. That inducement to enter the European market does not affect the issue before us. Our only interest is in determining whether the sales to GmbH were at an arm's-length price so that the petitioner realized, and subjected to United States taxation, an appropriate portion of the profits on the ultimate sales to the European manufacturers.

Under the comparable-price method, the arm's-length price is determined by reference to comparable sales to uncontrolled persons. GE was clearly an uncontrolled person, but the respondent contends that the sales of 1307's to it were not comparable. The respondent vigorously argues that under the petitioner's pricing policy, the prime discount was allowed only to domestic original equipment manufacturers and to the U.S. Government and that the petitioner favored GmbH by allowing it the prime discount. When it became necessary for the petitioner to establish the price to be charged GmbH for 1307's, the

petitioner decided to allow it the prime discount since it would be selling in competition with GE. No doubt, GmbH was not an original equipment manufacturer, but since it would be selling in competition with GE, the price charged it would have to be equal or close to that charged GE, if it was to realize any profit on the resale of 1307's.

Although GE was an original equipment manufacturer, it was acting as a distributor in dealing with its European licensees—it was purchasing the 1307's from the petitioner and reselling them to those licensees. The sales to GmbH were clearly comparable to those transactions. Under the Income Tax Regulations, sec. 1.482–2(e)(2), for a sale to be comparable, both the property and the circumstances of the sale must be identical. One of the circumstances to be considered is the level of the market. When we consider the sales to the ultimate purchasers, the European manufacturers of the J–79 engines, the sales of 1307's to GE and to GmbH were at the same market level. Moreover, both GE and GmbH performed comparable selling and servicing activities in connection with such sales. Both GE and GmbH were soliciting the European manufacturers of the J–79 engines and attempting to sell them the 1307's. Both warranted their products and stood ready to furnish postsales services. The evidence convinces us that GmbH furnished as much postsales services as did GE.

For the sales to be comparable, the terms of sale must be the same. In form, the terms of the sales to GE and to GmbH were the same, but the respondent urges us to look back of the form and conclude that in substance they were not comparable. Both GE and GmbH undertook to indemnify the petitioner against any tort liability, but the respondent contends that the promise by GmbH was not comparable in substance. In connection with the purposes for establishing GmbH, we were told that the petitioner was concerned about possible tort liability. There was some fear that a Starfighter might come down in a heavily populated area, causing extensive damage and resulting in substantial tort claims, especially if it were carrying nuclear weapons. However, we have no evidence as to the likelihood of such a tragedy occurring, nor as to the extent of the petitioner's possible liability. There was some indication that the petitioner had some insurance against such liability, and it is not clear as to what would be the petitioner's liability under European law. The respondent asks us to assume that the promise of GE was worth substantially more than that of GmbH; yet, we have no evidence as to GE's financial soundness. So far as we know, it may be as reliable as the Rock of Gibraltar, but recent events have demonstrated that not all business giants are financially sound. It sometimes requires a very sophisticated analysis of a financial report to determine the financial soundness of the busi-

ness. What the respondent is asking us to do is to speculate as to the occurrence and amount of such tort liability and as to the financial reliability of GE and GmbH. Since the petitioner has proved that the terms of the sales of 1307's to GE and GmbH were the same, it seems to us that if the respondent wishes to establish that those sales differed in substance, he must do more than merely raise questions and ask us to speculate as to their answers. Under these circumstances, we are satisfied that the terms of sale were comparable.

In considering whether the sales to GE were comparable and established an appropriate arm's-length price for the sales to GmbH, it should be remembered that the sales of 1307's to GE produced very satisfactory profits for the petitioner. Although its overall profits, expressed as a percentage of sales, were only 13 percent, it realized 17 percent from the sales in the aircraft product line. The petitioner was unable to furnish information as to its profits on the sales of 1307's, but sales of 1307's to GE constituted approximately 75 percent of the business done in the aircraft product line. Since some of the business in that product line was performed at little or no profit, it appears that the sales of 1307's to GE must have yielded 17 percent or more. Thus, this is not a situation in which a price was established by reference to sales in which there was little or no profit. *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990 (Ct. Cl. 1967). The sales to GE were producing satisfactory profits, and there was no reason to attempt to earn more on the sales to GmbH.

Although the respondent asserts that the petitioner would not have sold the 1307's to an independent company situated similarly to GmbH, there is no evidence to support that assertion. There is no evidence that the petitioner charged more for 1307's in sales to persons situated similarly to GmbH. In fact, aside from the sales to GE, the other most comparable sales were those to AEL. Parts for the 1307's were sold to AEL at the same prime discount—list less 50 percent, even though it, like GmbH, was not an original equipment manufacturer in the United States. It was a Canadian corporation; yet, it received the prime discount.

Under all the circumstances, we find and hold that the respondent acted arbitrarily in treating GmbH as a mere sales agency entitled to a commission on its sales of 1307's and that the petitioner has proved that the sales of 1307's to GE and GmbH were comparable.

In order to reflect other ajustments,

*Decision will be entered under Rule 50.*