## KANSAS CITY, ST. L. & C. R. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4924.

Circuit Court of Appeals, Fourth Circuit.

Nov. 12, 1942.

Arthur D. Walton, Jr., of Chicago, Ill. (Silas H. Strawn, Frank H. Towner, and Edward G. Ince, all of Chicago, Ill., on the brief), for petitioner.

Warren F. Wattles, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SOPER, DOBIE, and NORTHCOTT, Circuit Judges.

---

DOBIE, Circuit Judge.

This appeal is a review of a decision of the United States Board of Tax Appeals (hereinafter called the Board) in a proceeding in which the Kansas City, St. Louis and Chicago Railroad Company (hereinafter called the Lessor) sought: (1) the allowance of a claim for refund for overpayment of income taxes for the year 1933 in the amount of $19,398.44, and (2) the reversal of the Commissioner of Internal Revenue's determination of a deficiency in the Lessor's income taxes for 1933 in the amount of $32,845.61.

The Board (1) disallowed the claim for refund, and (2) determined a deficiency of $28,875. There is no further contention before us as to the Board's disallowing the Lessor's claim for refund. See United States v. Joliet & Chicago Railroad Company, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658. The remaining question for our consideration, then, is whether the deficiency of $28,875, as determined by the Board, is proper. In other words, did the Board err in deciding that the rental income accruable to the Lessor in 1933, by virtue of the indenture of lease to the Chicago and Alton Railroad Company (hereinafter called the Lessee), included a sum of money equal to the dividends paid or payable by the Lessee, pursuant to the lease, to the Lessor's stockholders on all classes of the Lessor's outstanding stock?

There is no real difficulty as to the facts in this case, virtually all of which were stipulated. We append the statement of facts, as found by the Board:

"The petitioner is a corporation, organized April 10, 1877, and existing under and by virtue of the laws of the State of Missouri, with its principal office at 340 West Harrison Street, Chicago, Illinois. It was incorporated for the purpose of constructing, acquiring, maintaining, and operating a railroad for public use. Its books and records were maintained and its Federal income tax return for the year 1933 was filed on the accrual basis of accounting.

"On March 15, 1878, petitioner and the Chicago & Alton Railroad Co., an Illinois corporation, entered into a written indenture, by the terms of which petitioner sold and transferred to the Chicago & Alton Railroad Co., its successors, and assigns $3,000,000 of its bonds dated March 15, 1878, maturing May 1, 1903, and $1,500,000 of its 7 percent preferred stock; and by

this indenture petitioner demised and leased to the Chicago & Alton, its successors, and assigns, forever, all the property then owned or thereafter to be acquired by it. The Chicago & Alton agreed thereunder that it would acquire at its own expense necessary additional right of way and would construct, furnish with rolling stock, and forever operate the railroad so demised and leased as a part of its main line, and keep the same in proper repair. The material provisions of the indenture are as follows:

"'And the said party of the first part, [the petitioner herein] for and in consideration of the covenants and agreements hereinafter contained, hereby sells and transfers unto the said party of the second part [the Chicago & Alton Railroad Co.], and its successors and assigns, the said bonds of the party of the first part hereinbefore mentioned, amounting in the aggregate to Three Millions of Dollars, with the coupons thereto attached, and the preferred stock hereinbefore mentioned, amounting in the aggregate to One Million Five Hundred Thousand Dollars, and also the proceeds of all subscriptions for capital stock and all subscriptions made by any and all persons or corporations of money or property for the purpose of aiding in the construction of said road or any portion thereof.

"'And the said party of the first part hereby demises and leases to the said party of the second part, its successors and assigns, forever, all and singular the right of way, railroad track, bridges, * * * and property of every kind, name and nature of the said party of the first part now owned by it, or which may be hereafter acquired by the same: To Have and to Hold the said bonds, coupons and preferred stock of the party of the first part, and the proceeds of the said subscriptions to the said party of the first part, and also all and singular the said right of way, railroad track, bridges, * * * and property of every kind, name and nature of the said party of the first part, now owned by it, or which may be hereafter acquired by the same, unto the said party of the second part, its successors and assigns forever, * * *

* * * * * *

"'And the said party of the second part hereby further agrees that it, the said party of the second part will pay unto the said party of the first part, as an annual rental for the use of said demised premises, half-yearly payments, to be made on the first

days of May and November in each year, a sum which shall be ascertained by a computation based upon the gross earnings of the preceding year ending on the 31st of December, as follows, that is to say:

"'From the gross earnings of said railroad during each year ending on the 31st of December, shall first be deducted sixty-five per cent. thereof for operating expenses, renewals and repairs, which shall be retained by said party of the second part. Second, All taxes and assessments of every description; and after deducting all Federal, State, county and municipal taxes and assessments from thirty-five per cent. of said gross earnings, the residue of the same shall constitute the rental for the calendar year, subject to the limitation hereinafter stated.

"'* * * and for the purpose of ascertaining the gross earnings of the railroad hereby demised, it is agreed that all rates common to the road of the party of the first part and the road of the Louisiana and Missouri River Railroad Company, or properly to be divided between them, shall be divided between said parties pro rata according to mileage; Provided, That from all rates for traffic which shall have crossed the Missouri River at or near Glasgow, said second party may, at its option, deduct a reasonable sum for bridge or ferry tolls before such division of rates between the party of the first part and the Louisiana and Missouri River Railroad Company is made, and the amount so deducted shall be considered part of the gross earnings of the property of the party of the first part herein referred to, and it is hereby agreed that the party of the second part shall at all times pay out of said rental the coupons issued with the said bonds of the party of the first part, and all dividends upon its preferred stock guaranteed to be paid by the said party of the second part, and the annual rental for each calendar year shall never be less than the coupons issued with said bonds outstanding and falling due in such year, and the dividend or dividends on the said preferred stock guaranteed to be paid by the party of the second part in such year.

"'And it is further agreed, that the annual rental for each calendar year shall never be more than the outstanding coupons falling due in such year, and a dividend in that year of seven per cent. upon the preferred and common stock of the party of the first part then outstanding.

    *    *    *    *    *    *

"'And Whereas, the party of the second part may desire to convert the bonds of the party of the first part hereby sold to the party of the second part into the preferred stock of the party of the first part hereinbefore mentioned, it is therefore agreed that the said party of the second part, may at its option exchange any or all of said bonds for preferred stock herein provided to be issued for said bonds upon the terms herein mentioned, and that upon such exchange, the party of the first part will issue certificates for such stock in the usual form, and deliver the same to the said party of the second part, transferable in the same manner as other stock of the party of the first part is allowed to be transferred.

"'And the said party of the second part may guarantee the absolute payment of a dividend of seven per cent. for each calendar year ending the 31st day of December, free of all United States taxes, on the aggregate amount of preferred stock not exceeding One Million Five Hundred Thousand Dollars, and upon request shall be entitled to certificates therefor in the usual form; and the holders of said preferred stock so guaranteed as aforesaid, shall be paid the said dividend out of the net earnings of the said party of the first part, if sufficient for that purpose, after paying coupons, taxes and assessments before any dividends shall be paid upon the residue of the preferred stock of the said party of the first part.

"'And the said party of the second part hereby further agrees that it will at all times pay all taxes and assessments hereafter, whether Federal, State, county or municipal, which are, or may be imposed against the premises hereby demised at the time when said taxes may be due and payable. * * *

    *    *    *    *    *    *

"'And the said party of the first part hereby covenants and agrees that it will at all times hereafter maintain its corporate organization and existence under the laws of Missouri; * * *'

"The action so taken by the petitioner had been authorized by its board of directors at a meeting held March 5, 1878, and by its stockholders at a meeting held the following day. At these meetings corporate action was also taken to authorize an issue of $3,000,000 face value of 7 percent bonds and an issue of $3,000,000 par value of 7 percent preferred stock which could be issued at any time to the Chicago & Alton

Railroad Co., upon its request, but only in exchange for the $3,000,000 of bonds. At the same time an additional issue of $1,-500,000 par value of 7 percent preferred stock was similarly authorized, which was to be upon an equality with the $3,000,000 of preferred stock already authorized.

"Thereafter, by an agreement dated May 29, 1879, between the petitioner, the Chicago & Alton Railroad Co., and the United States Trust Co. of New York, $1,750,000 par value of 6 percent preferred stock was issued to the Chicago & Alton Co. in lieu of the $1,500,000 par value of 7 percent preferred stock theretofore issued to it. The agreement further recited that the Chicago & Alton Co. had fully paid for the $1,750,000 par value of preferred stock by the construction and equipment of petitioner's railroad, and that, for the purpose of selling such stock, the Chicago & Alton Co. covenanted and agreed with the United States Trust Co. that it would, on the first day of February, May, August, and November in each year, at the office or agency of the Chicago & Alton Railroad Co. in New York City, pay to the holders of the preferred stock of $1,750,000 a quarterly dividend of 1½ percent for each calendar year ending December 31, free of all United States taxes thereon.

"In March 1903 the original bonds were exchanged by the Chicago & Alton Co. for $3,000,000 par value of petitioner's 7 percent preferred stock, authorized March 5 and 6, as above set forth.

"The Board finds as a fact that the substitution of the $1,750,000 par value of 6 percent guaranteed preferred stock for the original $1,500,000 par value of 7 percent guaranteed preferred stock, and the substitution of the $3,000,000 par value of 7 percent preferred stock for the bonds originally outstanding, was made without change in the basis for computation of annual payments.

"During the year 1931, pursuant to final decree of foreclosure and sale entered by the District Court on July 6, 1929, the Alton Co. acquired the assets and business of the Chicago & Alton Railroad Co., which included, among other assets, the aforesaid leasehold estate created by the indenture of March 15, 1878. Included also in such assets were the $3,000,000 par value of 7 percent preferred stock of petitioner and also $157,600 par value of petitioner's common stock. An election was provided in the decree whereby the Alton Co. had a

period of one year in which to disaffirm any contracts entered into by the Chicago & Alton Railroad Co. Extensions of time have been obtained from time to time on this election clause by order of the court, and such election was still available to the Alton Co. at least until July 18, 1940.

"During the year 1933 petitioner's outstanding securities were held as follows:

| Stocks | Alton Co. | Public |
|---|---|---|
| $3,000,000 par value 7% preferred | $3,000,000 | ......... |
| $1,750,000 par value 6% preferred | ......... | $1,750,000 |
| $271,800 par value common | 157,600 | 114,200 |

"During the years 1917 to 1933, inclusive, books and records of the Alton Railroad Co. and of its immediate predecessor, the Chicago & Alton Railroad Co., were kept pursuant to the classification of income, profit and loss, and general balance sheet accounts for steam roads prescribed by the Interstate Commerce Commission in accordance with section 20 of the Act to Regulate Commerce, effective July 1, 1914. Under this classification an account, No. 542, captioned "rent for leased roads" was a part of the income accounts so maintained. The account represents a deduction from income under the general heading "Fixed Charges." For the years 1917 to 1924, inclusive, a constituent part of this account (which was stated in gross) was an amount of $112,994 representing 6 percent dividends on the $1,750,000 of petitioner's guaranteed preferred stock and 7 percent dividends on the 11,420 shares of its publicly owned common stock. From 1925 to 1932, inclusive, the constituent amount was $124,026, being an increase of $11,032 over the prior amount, representing the addition of the amount of 7 percent dividends on petitioner's common stock owned by the Alton Co. For the year 1933 this amount was further augmented by the sum of $19,398.44, being the accrued income tax liability evidencing the amount of income taxes on such dividends, making a total constituent amount of $143,424.44 in the account.

"From 1881 to 1908, inclusive, the petitioner regularly declared annual dividends on all of the outstanding common stock and intermittently on the $3,000,000 of 7 percent preferred stock and the $1,750,000 of the 6 percent guaranteed preferred stock. From 1908 to 1916, inclusive, the petitioner regularly declared annual dividends of 7 percent on the $3,000,000 of 7 percent preferred stock; 6 percent on the $1,750,000 guaranteed preferred stock, and 7 percent

on the $271,800 of common stock. From 1916 to and including 1933, the petitioner regularly declared annual dividends of 6 percent on the $1,750,000 of 6 percent guaranteed preferred stock and 7 percent on the $271,800 of common stock. All dividend payments that were actually made were at all times paid by the Alton Co. directly to petitioner's stockholders. There were no dividend payments made at any time of dividends declared on stock of the petitioner owned by the Alton Co. The Alton Co.'s books contained no entries reflecting payment or receipt of dividends on any of petitioner's stock owned by Alton until 1925, when entries were made reflecting the dividends on the Alton owned common stock of the petitioner.

"During the calendar year 1933 the dividends declared by petitioner were paid by the Alton Co. in the following amounts, to wit: 6 percent on the $1,750,000 of petitioner's preferred stock held by the public and 7 percent on the $114,200 par value of petitioner's common stock in the hands of the public. Such dividend payments were made by the Alton Co. directly to the holders of the stock. No dividend payments were made by the Alton Co. on the $3,000,000 par value of 7 percent preferred stock of petitioner owned by the Alton Co.

"However, during the year 1932, there were net revenues from the premises here in question available for the payment of rent in the approximate amount of $729,000, this amount having been computed by deducting from gross earnings of the premises operating expenses of 65 percent of gross earnings and all taxes thereon.

"Petitioner reported $141,079.58 as taxable income for the year 1933, being the aggregate amount of the dividends on the guaranteed preferred stock and the common stock (including that owned by the Alton Co.), a total of $124,026, plus the tax thereon of $17,053.58, which was paid by the Alton Co."

Section 22 of the applicable Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 487, provides: "(a) General Definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from inter-est, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

Article 70 of Treasury Regulations 77, promulgated under the Revenue Act of 1932 (for approval of an identical regulation, Article 70 of Treasury Regulations 74 which was promulgated under the Revenue Act of 1928, see United States v. Joliet & Chicago Railroad Company, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658), provides: "Art. 70. Income to lessor corporation from leased property.—Where a corporation has leased its property in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock or the interest on the lessor's outstanding indebtedness, together with taxes, insurance, or other fixed charges, such payments shall be considered rental payments and shall be returned by the lessor corporation as income, notwithstanding the fact that the dividends and interest are paid by the lessee directly to the shareholders and bondholders of the lessor. The fact that a corporation has conveyed or let its property and has parted with its management and control, or has ceased to engage in the business for which it was originally organized, will not relieve it from liability to the tax. While the payments made by the lessee directly to the bondholders or shareholders of the lessor are rentals as to both the lessee and lessor (rentals paid in one case and rentals received in the other), to the bondholders and the shareholders such amounts are interest and dividend payments received as from the lessor and as such shall be accounted for in their returns."

According to the terms of the indenture of lease, the Lessee was obligated to pay for each year an amount of rental based upon (and conditioned by) the earnings of the leased properties for the prior year. The Indenture prescribed an accurate formula for the computation of the amount of the annual rent, subject to a certain maximum limitation. We are here concerned with the rental for the year 1933, which was computed on the basis, subject to the maximum limitation, of the earnings of the leased properties for the year 1932.

The Board found that the earnings of the leased properties for the year 1932 (computed under the terms of the Indenture) were sufficient in amount to require

payment by the Lessee, as rental for 1933, of an amount equal to the dividends payable on the outstanding stock of the Lessor. These earnings thus exceeded the prescribed maximum limitation. There was ample evidence to support this finding. We, therefore, cannot disturb it on appeal. Helvering v. National Grocery Co., 304 U. S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Kehoe, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751; Helvering v. Edison Securities Corporation, 4 Cir., 78 F.2d 85, 87. It is quite significant, too, that this finding of the Board accords with the contemporary annual report filed by the Lessor with the Interstate Commerce Commission.

The Lessee was the owner of all the Lessor's outstanding 7% preferred stock of the par value of $3,000,000. The Lessee did not write a check payable to itself for $210,000 in payment of this dividend for the year in question. This mere short-circuiting of the payment to itself by the Lessee, in doing nothing as to the payment of the dividend (due by itself to itself) is of no legal consequence in fixing the taxable income of the Lessor under the Indenture. As was well said by Circuit Judge Augustus Hand in Gold & Stock Tel. Co. v. Commissioner, 2 Cir., 83 F.2d 465, 468: "It is argued that the rentals payable upon the large stockholdings of the Western Union itself should not be taxed as income of the lessor because the rentals to that extent were not paid out, but we can see no merit in the contention. The Western Union, like every other stockholder of the lessor, chose to acquire an interest in the corporate association. Rent accrued to it as a stockholder of the corporation and, whether it chose to pay it to itself or not, its rights were as truly worked out through the corporation as those of the other stockholders. The property of the corporation of which it was a beneficiary yielded a return, and that corporation cannot avoid taxes because the guaranty could not be enforced by the Western Union against itself."

See, also, United States v. Joliet & Chicago Railroad Co., 315 U.S. 44, 62 S.

Ct. 442, 86 L.Ed. 658; Pacific & Atlantic Telegraph Co. v. Commissioner, 2 Cir., 83 F.2d 469, certiorari denied 299 U.S. 564, 57 S.Ct. 26, 81 L.Ed. 415; American Telegraph & Cable Co. v. United States, 61 Ct. Cl. 326, certiorari denied 271 U.S. 660, 46 S.Ct. 473, 70 L.Ed. 1137. Within these authorities, these facts constitute a constructive receipt of income by the Lessor.

The Lessor contends that the Alton Railroad Company (which acquired the assets and properties of the Lessee in 1931) had the power under a court decree to disaffirm contracts entered into by its predecessor; that the Alton Railroad Company never ratified the lease in writing, but that the Alton Railroad Company, in July, 1941, expressly elected not to be bound by the Indenture. On the exact state of affairs in this respect the record is not altogether clear. Even, however, if we assume the facts to be as the Lessor contends, they are still not helpful to the Lessor in the instant proceeding. There is no ground here for the application of the principle of relation back.

The power in question was one to disaffirm, not to affirm. In the year 1933, the Alton Railroad Company enjoyed the benefits of the Indenture. Those events that took place here in the year 1941 do not affect the federal income tax liability of the Lessor for the year 1933. Each taxable year, for the purposes of federal income taxes, must be regarded as an independent unit. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 365, 366, 51 S.Ct. 150, 75 L. Ed. 383; Helvering v. State-Planters Bank & Trust Co., 130 F.2d 44, decided by our Court August 18, 1942. See, also, Houbigant, Inc., v. Commissioner, 31 B.T.A. 954, affirmed 2 Cir., 80 F.2d 1012, certiorari denied 298 U.S. 669, 56 S.Ct. 834, 80 L.Ed. 1392; Nash v. Commissioner, 7 Cir., 88 F. 2d 477, certiorari denied 301 U.S. 700, 57 S. Ct. 930, 81 L.Ed. 1355.

The judgment of the Board of Tax Appeals is affirmed.

Affirmed.