**BALLENTINE MOTOR CO., Inc., Ballentine's, and Ballentine Motors, Inc., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 8975.

United States Court of Appeals Fourth Circuit.

Argued June 6, 1963.

Decided Aug. 19, 1963.

William L. Watkins, Anderson, S. C. (Watkins, Vandiver, Freeman & Kirven, Anderson, S. C., on brief), for petitioners.

Giora Ben-Horin, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, on brief), for respondent.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

BOREMAN, Circuit Judge.

This is an appeal from a decision of the Tax Court [1] upholding the assessment of income tax deficiencies by the Commissioner of Internal Revenue. Separate petitions, filed by taxpayers, were consolidated for hearing, briefing and disposition before the Tax Court. That Court's findings of fact, which appear to be fully supported by the evidence, are not disputed. Challenged here by taxpayers are the inferences and conclusions drawn by the Tax Court from the facts.

During the period pertinent to these proceedings, C. M. Ballentine was the president and controlling stockholder of the three family-owned corporations, namely, Ballentine Motor Co., Inc., Ballentine's, and Ballentine Motors, Inc., which are the taxpayers and appellants. He was president and controlling stockholder of another such corporation known as Ballentine Motors of Georgia, Inc., and several other such corporations the identity of which is not here material. All of these corporations were engaged in the operation of certain used car lots. Ballentine Motor Co., Inc., owned and operated two such lots at Columbia, South Carolina; Ballentine's owned and operated one such lot at Anderson, South Carolina; Ballentine Motors, Inc., owned and operated one such lot at Augusta, Georgia; and Ballentine Motors of Georgia, Inc., owned and operated one such lot at Atlanta, Georgia.

In 1949 Motor Investment Company, a corporation (hereinafter called Investment), was organized under South Carolina laws to finance the installment sales of automobiles by the various used car lots. It kept the records of the other corporations and was compensated therefor by a percentage of sales from the lots. On June 15, 1951, the stock of Investment was owned by C. M. Ballentine, members of his family and his controlled corporations. On June 15, 1951, Investment sold its automobile finance paper (notes, contracts, etc.) to Commercial Credit Corporation (hereinafter referred to as C.C.C.) and agreed not to engage in the business of purchasing notes for one year. Commencing in 1951, under a contract referred to as a "Reserve Agreement," each Ballentine-owned corporation began selling the finance paper that it received in connection with the credit sales of automobiles from its respective used car lot to C.C.C. Under the Reserve Agreements, C.C.C. agreed to pay to each corporation, in addition to the unpaid portion of the purchase price of the cars involved, a portion of the finance charges on each note computed in accordance with a certain formula but subject to certain maximum amounts on each note. The agreed for-

---

1. Ballentine Motor Co., Inc. et al., 39 T.C. No. 30 (November 6, 1962).

mula and the maximums, or "caps," were well-established in the automobile financing business generally during the years involved; and C.C.C., understandably, was unwilling to pay the Ballentine corporations in excess of the generally established maximums because of the probable effect on C.C.C.'s bargaining position with other dealers. However, in order to insure the continued business of the three Ballentine corporations which are parties to this proceeding, and of Ballentine's other dealer corporations, C.C.C., on May 19, 1952, entered into a written agreement with C. M. Ballentine individually whereby C.C.C. agreed to pay directly to him that part of the formula-computed portion of the finance charges which was in excess of the standard "caps" to which the payments to the corporations under the Reserve Agreements were subject. The various corporate dealers controlled by Ballentine were the largest single customers of C.C.C., and the only consideration to be furnished under the agreement by Ballentine himself was to insure that his dealer corporations would continue to deal with C.C.C. exclusively and to stimulate the salesmen employed by each such dealer corporation to promote time sales, thereby increasing the volume of business between the Ballentine corporations and C.C.C. Under the provisions of this collateral agreement during the years involved herein, C. M. Ballentine received a total of $41,472 from C.C.C. as a result of the combined business transactions between C.C.C. and the three taxpayer corporations, all of which was reported as ordinary income on the joint income tax returns of C. M. Ballentine and his wife. The Commissioner determined that this sum represented income earned by the taxpayer corporations and such part thereof should be taxed to the particular corporation which made the sales from which the payments were derived. Upon review, the Tax Court sustained the Commissioner's determination on the ground that the income in question was actually earned by the corporations and, therefore, was taxable as such to them despite the fact that it was paid to Ballentine personally.

■■ The parties agree that the determination as to whether the income was earned by Ballentine or by the respective corporations is, at least primarily, the determination of a question of fact and, in order for this court to reverse the finding of the Tax Court, it must be shown that the finding is clearly erroneous. See Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Fed.R.Civ.P. 52 (a). However, it is our view that the Tax Court's finding in this regard is not clearly erroneous but is clearly right. The decisions cited in the opinion of the Tax Court squarely support its finding. Union Stock Farms v. Commissioner, 265 F.2d 712 (9th Cir., 1959); United Dressed Beef Co., 23 T.C. 879 (1955). See also United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658 (1942); Kansas City, St. L. & C. R. Co. v. Commissioner, 131 F.2d 940 (4th Cir., 1942); Eastern Carbon Black Co. v. Brast, 104 F.2d 460 (4th Cir., 1939). The finance paper sold with respect to which the payments to Ballentine were made was owned by the corporations and the amounts paid to Ballentine varied in direct proportion to the quantity of finance paper sold by the corporations. The payments were made to C. M. Ballentine personally rather than directly to the corporations for the sole purpose of concealing from other dealers the fact that C.C.C. was paying more than the generally established maximum for the finance paper of the Ballentine dealer corporations. Obtaining the additional payments above usual "caps" was possible in the instant case because of the comparatively great value to C.C.C. of the business of the Ballentine corporations. As found by the Tax Court, "The extra payments were made because of the volume of business provided by the corporations, and their sales earned these extra rebates." Under the facts here, the cases cited by the taxpayers

to support their position [2] are not applicable as in each of those cases the individual to whom the money was paid performed some service or assumed some obligation separate and distinct from the operations of the corporation to which the Commissioner sought to allocate and assess the income.

■ The only other issue on this appeal involves the application of Section 482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 482, giving to the Commissioner the right, in the case of two or more organizations, trades or businesses, controlled by the same interests, to distribute, apportion or allocate gross income, deductions, credits or allowances between or among such organizations if he determines that such allocation is necessary to prevent evasion of taxes or clearly to reflect income. During 1954, when the Ballentine corporation operating the Atlanta lot had an operating deficit of $59,919.27 resulting from operating losses in 1951, 1952 and 1953, the inventory of automobiles on the Anderson and Columbia lots, owned and operated by two of the taxpayer corporations, was sold to the Atlanta lot (Ballentine Motors of Georgia, Inc.) which, in effect, assumed control of and operated the Anderson and Columbia lots at a profit during the remainder of 1954.[3] Other inventory

2. Paramount Finance Co. v. United States, 304 F.2d 460 (Ct.Cl.1962); Raymond Pearson Motor Co. v. Commissioner, 246 F.2d 509 (5th Cir., 1957); Moke Epstein, Inc., 29 T.C. 1005 (1958).

3. On May 10, 1954, Ballentine Motors of Georgia, Inc., acquired from Ballentine's its entire inventory of automobiles on the Anderson, South Carolina, lot at book value of $54,637.31. The transaction was closed in Anderson, South Carolina, by a simultaneous exchange of checks. Ballentine's owed Motor Investment Company (called Investment) $6,-000 on May 10, 1954, and on that date Investment made a loan to Ballentine Motors of Georgia by a check for $70,-000 deposited to the account of the latter in Carolina National Bank at Anderson. On the same day Ballentine Motors of Georgia issued its check to Ballentine's in the amount of $54,367.31 which was deposited in the same bank to Ballentine's account. On the same date Ballentine's issued its check to Investment for $82,500 which was deposited to the account of Investment in the bank and credited to Ballentine's account on the books of Investment. Until January 1, 1955, the Anderson lot was treated on the books of Ballentine Motors of Georgia as its own and the net profits from its sales during the May 10, 1954, to January 1, 1955, period are the profits which the Commissioner in this case allocated to Ballentine's in 1954.

On June 15, 1954, Georgia acquired from Ballentine Motor Company, Inc., its entire inventory of automobiles located on the two Columbia, South Carolina, lots. The book value of this inventory was $130,056.71. The transaction was closed in Anderson, South Carolina, by a simultaneous exchange of checks. Ballentine Motor Company owed Investment $46,-400 at that time. On that date Investment made a loan to Ballentine Motors of Georgia, by checks deposited to the account of the latter in Carolina National Bank at Anderson, in the amount of $126,-000. On the same date Ballentine Motors of Georgia issued two checks to Ballentine Motor Company in the aggregate amount of $130,056.71 and these were deposited to the account of Ballentine Motor Company in the same bank. On the same date Ballentine Motor Company issued two checks to Investment for an aggregate amount of $130,000 and these were deposited to the account of Investment in the same bank and credited to the account of Ballentine Motor Company on the books of Investment. These lots were thereafter, until January 1, 1955, treated on the books of Ballentine Motors of Georgia as its own and the net profits from their sales during the period from June 15, 1954, to January 1, 1955, are profits which the Commissioner has allocated to Ballentine Motor Company in 1954.

After these purchases of inventories, bills of sales for cars sold at the Anderson and Columbia lots were executed in the name of Ballentine Motors of Georgia. Separate ledger sheets were set up to record the transactions of the three separate lots. Expenses incurred at the lots after such dates were paid by checks of Ballentine Motors of Georgia. Employees of the Anderson lot received two forms W-2 in 1954, one indicating that their employer up to May 10, 1954, was Ballentine's and the other indicating that their employer after May 10, 1954, was

was purchased and sold at these Anderson and Columbia lots in addition to the inventory purchased from them by the Atlanta lot. At the end of 1954, the then existing and remaining inventory on the Anderson and Columbia lots was transferred to two other Ballentine corporations. Under the authority of section 482 of the Internal Revenue Code, the Commissioner determined that the transactions described constituted merely a device for the evasion of income taxes and allocated the net income earned from the operation of the Anderson and Columbia lots during pertinent periods of 1954 to the corporations which had originally operated them. The Tax Court approved the Commissioner's allocation and held that these transactions were an attempt to make use of Georgia's net operating loss carry-over.

█ It is conceded by the taxpayers that all three of the corporations involved in the transactions were controlled by the same interests and therefore subject to the provisions of the code section involved. Under the applicable statute the Commissioner is vested with broad discretion. His determination in this regard will be overturned only if shown by the taxpayer to have been arbitrary or unreasonable. A determination as to whether or not the Commissioner has exceeded or abused his discretion turns upon questions of fact and is subject to limited review. Hall v. Commissioner, 294 F.2d 82 (5th Cir., 1961); Aiken Drive-In Theatre Corp. v. United States, 281 F.2d 7 (4th Cir., 1960); Commissioner v. Chelsea Products, Inc., 197 F. 2d 620 (3d Cir., 1952).

The operation of the Columbia and Anderson lots by the Atlanta, Georgia, dealer corporation continued only long enough for the pre-existing operating loss carry-over to be offset by the profits derived from the lots, at the end of which period the inventory on the lots was transferred to other Ballentine corporations. The purchase of the inventories by the Atlanta dealership in the first instance had been accomplished by virtue of a loan from another Ballentine-controlled corporation; no changes were made in either the operating personnel or the management of the Columbia and Anderson lots after the purchase; and the Atlanta dealership did not purchase either the leases under which the lots had been operating or the buildings or other business fixtures and equipment on the lots.

From these facts the Tax Court reached the ultimate conclusions that the overall plan of taxpayers from the beginning was to arbitrarily shift income among businesses controlled by C. M. Ballentine; that this temporary shifting was but a flagrant attempt to make use of the Georgia corporation's net operating loss carry-over and to avoid the payment of taxes; that no bona fide business purpose was shown as the basis of these 1954 operations.

Since the issue here for determination involves inferences drawn, and ultimate conclusions reached, by the Tax Court from undisputed facts, it is not particularly helpful to engage in a discussion of

---

Ballentine Motors of Georgia. Employees of the Columbia lots each received two forms W-2 indicating that prior to June 15, 1954, they were employed by Ballentine Motor Company and that subsequent to that date they were employed by Ballentine Motors of Georgia.

At the time of the transactions referred to, the two lots in Columbia had office buildings on them that cost about $6,000 or $8,000. The lot at Anderson had an office building and other leasehold improvements that cost in excess of $18,000 and furniture and fixtures that cost about $4,000. Each lot also had wash racks

and other machinery and equipment. Nothing was paid by Ballentine Motors of Georgia for these leasehold improvements or other fixtures or equipment and Ballentine Motor Company and Ballentine's continued to claim depreciation and amortization of the assets throughout the year 1954. The leases under which Ballentine's and Ballentine Motor Company occupied the car lots in Anderson and Columbia were not transferred to Ballentine Motors of Georgia but the latter paid the rent on these lots after the purchase of the respective used-car inventories.

other cases presenting different factual situations. Suffice it to say that in T. V. D. Co., 27 T.C. 879 (1957), relied upon by the taxpayers, the Tax Court found that under all of the facts of that case a bona fide "business purpose" was apparent and that tax avoidance was not the primary purpose of the transactions.

Under the facts and circumstances of the instant case, the finding and conclusion of the Tax Court to the effect that the Commissioner did not abuse his discretion or act arbitrarily, capriciously or unreasonably in invoking and applying the statute (Sec. 482) are satisfactorily supported by the evidence and should not be disturbed.

Affirmed.