Pacific Northwest Food Club, Inc. v. Commissioner.
Pacific Northwest Food Club, Inc. v. Commissioner
Docket No. 93804.
United States Tax Court
T.C. Memo 1964-8; 1964 Tax Ct. Memo LEXIS 327; 23 T.C.M. (CCH) 29; T.C.M. (RIA) 64008; January 20, 1964
*327 Petitioner was engaged in the business of packing and marketing carrots. Pursuant to a contract, it hired another corporation, controlled by petitioner's sole shareholder, to perform the carrot-packing function. Subsequent to the execution of this contract and at all times relevant to this proceeding the material income-producing factors of the carrot-packing operation were furnished by petitioner. Held: The Commissioner properly allocated to petitioner pursuant to sec. 482, I.R.C. 1954, the income reported by the controlled corporation but actually earned by petitioner. Petitioner claimed a business bad debt deduction pursuant to sec. 166, I.R.C. 1954, on account of the alleged loss of certain dealer's reserves. Held: Petitioner failed to prove either the worthlessness of any debt owned to it or the year in which any such debt became worthless. Willard D. Horwich, 170 N. Robertson, Beverly Hills, Calif., for the petitioner. Douglas W. Argue, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined a deficiency in petitioner's income tax for the fiscal year ended February 28, 1958, in the amount of $48,744.22. The issues presented for *328 decision are as follows: [1] (1) Whether the Commissioner, pursuant to section 482 of the Internal Revenue Code of 1954, [2] was correct in allocating to petitioner for the fiscal years ended February 28, 1958 and 1959, the taxable income (exclusive of a net operating loss carryover deduction) reported for the fiscal year ended June 30, 1958, by Fomco, Incorporated, a corporation controlled by petitioner's sole shareholder; and (2) whether petitioner was entitled to a bad debt deduction in the amount of $21,585.66 in any year affecting its net operating loss carryover for the fiscal year ending February 28, 1958. Petitioner did not assign error to respondent's apportionment, as between petitioner's fiscal years ended February 28, 1958 and 1959, of the income and expense reported by Fomco, Incorporated, for its fiscal year ended June 30, 1958, as set forth in Exhibit A attached to the notice of deficiency. We assume therefore that petitioner concedes the correctness *329 of this apportionment in the event issue (1) is decided adversely to it. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner is a corporation organized under the laws of the State of Washington in March 1953. It filed its Federal income tax returns for the fiscal years ended February 28, 1958 and 1959, with the district director of internal revenue, Los Angeles, California. Petitioner's president and controlling shareholder is Joseph G. Shabouh (hereinafter referred to as Shabouh). Shabouh was a co-founder of the petitioner. In 1954 he acquired, and has retained at all times relevant to this proceeding, all of the outstanding stock in petitioner with the exception of two qualifying shares. From 1953 to the early part of 1955, petitioner engaged in the business of selling food freezers in the State of Washington, and in those years sustained substantial operating losses in connection with this business. Fomco, Incorporated (hereinafter referred to as Fomco), an Oregon corporation, was similarly engaged in the business of selling food freezers in Oregon *330 from the time of its incorporation in October 1953 through the early part of 1955. Fomco also incurred substantial operating losses in connection with this business. Shabouh has been president of Fomco since its incorporation, at which time he acquired 50 percent of its outstanding stock. In 1954 he acquired, and has retained at all times relevant to this proceeding, all of the outstanding stock in Fomco with the exception of 17.5 percent of the shares. Shabouh, from 1953 to May 1956, conducted a produce business in Los Angeles, California, which he operated as a sole proprietorship under the name of Pacific Growers Marketing Company (hereinafter sometimes referred to as Proprietorship). The principal business activity of Proprietorship was the packing of carrots and the marketing of them throughout the country. Petitioner qualified to do business in California on May 25, 1956, and within a short time thereafter purchased the assets and business of Proprietorship. As of June 1, 1956, petitioner took over the carrot packing and marketing operations formerly conducted by Proprietorship. Petitioner's principal business address, and also the location of its packing plant, during the years *331 involved was 4242 District Boulevard, Vernon, California. Pursuant to an agreement dated July 31, 1956, George E. Haddad (hereinafter referred to as George), a former employee of Proprietorship, was employed by petitioner as its sales manager. As such George was in charge of sales and the carrot-packing operation. At all times relevant to this proceeding he did, in fact, supervise the packing operations. The only assets of Fomco as of July 1, 1956, were cash in the amount of $785.06, accounts receivable of $8,770.50, a bank finance reserve in the amount of $44,737.22, and an organizational expenditure of $103.46. The accounts receivable and bank finance reserve represented the "then known uncollected balance" due from food freezer sales by Fomco during 1953 and 1954. In October 1956 petitioner, Fomco, an individual named Abraham Haddad (an acquaintance of, but not related to George Haddad), and a fourth party (a carrot farmer) entered into a series of contracts in connection with the growing, packing and marketing of carrots. (These contracts will hereinafter be referred to as the October 1956 contracts.) In accordance with the October 1956 contracts, the farmer shipped the carrots *332 raised to petitioner. However, contrary to the provisions of the October 1956 contracts, the carrots were paid for by Abraham Haddad (hereinafter referred to as Abraham) and petitioner, rather than by Abraham and Fomco. Moreover, on its income tax return for the fiscal year ended June 30, 1957, Fomco listed its principal business activity as "freezer sales." It listed no item of income or expense attributable to the purchase or sale of carrots pursuant to the October 1956 contracts. Although Fomco qualified to do business in California as of November 16, 1956, it was not until July 1957 that Fomco was "reactivated" by Shabouh to take part in the produce business. Consequently, despite the fact that Fomco appeared as a principal in each of these contracts, it never performed any of its obligations, nor exercised any of its rights thereunder, such as purchasing the carrots, paying petitioner for its services, reimbursing petitioner for its expenses, or paying its share of the costs of growing the carrots. On July 1, 1957, petitioner entered into a contract (hereinafter sometimes referred to as the July 1, 1957, packing contract) with Fomco wherein Fomco agreed to act as petitioner's *333 packer in connection with petitioner's carrot-packing business in general. Pursuant to this contract, petitioner agreed to pay, as an agent but not as a principal, Fomco's labor costs and the costs of packing materials and supplies. The contract recited that petitioner was making these payments on behalf of Fomco because petitioner already possessed the necessary payroll identification numbers and licenses from the various governmental authorities and had established credit in the business community of Southern California and elsewhere in the United States. Fomco had not established credit in the business community. The agreement contained a schedule of the packing charges. The basic packing charge was $1.75 for a 48- 1 lb. crate. [3]
As of July 1, 1957, Fomco had no assets except for a bank finance reserve of $38,901.42 (representing the "then known uncollected balance" due from food freezer sales in Oregon in 1953 and 1954) and an organizational expenditure of $103.46. During the period from July 1, 1957, to June 30, 1958, Fomco listed two principal additional assets *334 on its balance sheet, namely, accounts receivable of $85,194.63 and inventory of $37,216.56. The $85,194.63 accounts receivable represented sums due to Fomco from petitioner as of June 30, 1958, pursuant to the July 1, 1957, packing contract. Of the $37,216.56 inventory, the major portion thereof became an asset on Fomco's balance sheet by virtue of bookkeeping entries made by petitioner and Fomco on March 30, 1958. The remainder resulted from purchases of inventory items made by Fomco with funds advanced by petitioner during the period March 31, 1958, to June 30, 1958. Carrot packing involves a continuous operation of processing, somewhat resembling assembly line production. The machinery needed is generally quite extensive, as is petitioner's. The carrot-packing operation conducted by petitioner is complex and requires the supervision of a person with experience in that line of work. At all times relevant to this proceeding, the trade name of the carrot-packing and marketing operation was Pacific Growers Marketing Company, which name petitioner had acquired when it took over the business formerly conducted by Proprietorship. Fomco, at all times relevant hereto, possessed no packing *335 equipment or plant. Its address was the same as petitioner's. There was no difference between the way the packing operation was performed before and after July 1, 1957. The same carrotpacking equipment, employees and packing plant location used by petitioner prior to the July 1, 1957, packing contract continued to be used for carrot-packing operations subsequent to that date. Petitioner's income tax returns for the fiscal years ended February 28, 1958 and 1959, reflect no rental income. The carrot-packing employees continued to be paid by petitioner until February 28, 1958. From that date until June 30, 1958, the employees used in the carrot-packing operation were paid by Fomco with funds advanced by petitioner. After July 1, 1956, all taxes due under the Federal Unemployment Taxing Act and the Federal Insurance Contributions Act on account of wages paid to these employees were collected and paid over by petitioner until February 28, 1958. During this period petitioner also filed withholding tax returns covering these wages. After February 28, 1958, some of the packing expenses were paid by both Fomco and petitioner. Petitioner advanced the funds used by Fomco for the payment of these *336 expenses. Petitioner's books and records consisted of the usual ledger, cash sales and purchases journals. For the period July 1, 1956, to February 28, 1958, all sales of carrots and all expenses incurred in the purchase, packing and marketing of carrots were paid by petitioner and entered in its books of account. The books and records of Fomco similarly consisted of the usual ledger, cash sales and purchases journals. Fomco initiated the keeping of records relating to its receipts and disbursements from the carrot-packing operation as of March 31, 1958. Transactions between petitioner and Fomco were extracted from petitioner's books and records and entered into those of Fomco. As of June 30, 1958, additional summary entries were made in Fomco's books reflecting operations for the period ended June 30, 1958. It was not until sometime shortly before December 21, 1957, that petitioner's sales manager, George, first learned of the existence of Fomco. On December 21, 1957, his employment agreement of July 31, 1956, with petitioner was amended to provide that he was also to be employed by Fomco and that any reference to petitioner in the original agreement should be interpreted to include *337 Fomco. George had no idea that Fomco was supposedly conducting the carrotpacking operation until sometime in 1958 when he learned that there was a packing contract between petitioner and Fomco. A new corporation, Pacific Growers Marketing Company, Inc., was organized under the California corporation laws on June 30, 1958, to take over the carrot purchasing and marketing business conducted by petitioner and the carrot-packing functions allegedly conducted by Fomco. By this time petitioner had entirely, and Fomco had almost entirely, exhausted their respective net operating loss carryovers. Petitioner's income tax return for the fiscal year ended February 28, 1957, shows no taxable income because a net profit of $5,758.27 from the year's operations was offset by a net operating loss carryover deduction of $40,751.70 arising from losses previously incurred by petitioner in its freezer sales business. Petitioner's return for the fiscal year ended February 28, 1958, shows gross receipts of $882,360.74 and a net profit of $35,853.31 from that year's operations, but because of a net operating loss carryover of $34,993.43 the return shows a taxable income of merely $859.88. Fomco's return *338 for the fiscal year ended June 30, 1958, shows gross income of $440,483.63 and expenses of $367,533.26. From the resulting figure, Fomco deducted a net operating loss carryover of $75,475.22, leaving a taxable income of zero and a net operating loss carrying forward of $2,524.85. Shabouh was aware of the tax benefits to be derived from bringing Fomco into the carrot-packing business. Respondent increased petitioner's taxable income for the fiscal year ended February 28, 1958, by $80,004.32, and in the notice of deficiency explained this action as follows: (a) It has been determined under section 482 of the Internal Revenue Code of 1954 that $80,004.32, representing the income reported by Fomco, Inc., which corporation was owned and controlled by your officers and stockholders, should be allocated to you. Accordingly, your taxable income has been increased by the above amount. This action was necessary in order to prevent the evasion of taxes and to clearly reflect your income and the income of Fomco, Inc. In an attachment to the deficiency notice respondent apportioned the income reported by Fomco for its fiscal year ended June 30, 1958, between petitioner's fiscal years ending February *339 28, 1958, and February 28, 1959, as follows: Income and Expenses Reported by Fomco, Inc. for the Fiscal Year Ended June 30, 1958: Petitioner's Fiscal Year
2/28/58
2/28/59
Ended:
Income
$287,648.47
$152,835.16
Less: Costs
$ 41,664.50
$158,700.30
Miscellaneous expenses
532.37
532.37
Depreciation
656.44
656.44
Other
164,790.84
207,644.15
159,889.11
Balance
$ 80,004.32
$ (7,053.95)
Fomco's taxable income (exclusive of the net operating loss carryover deduction claimed by it) for its fiscal year ended June 30, 1958, was actually earned by and attributable to petitioner. During the period from March 1953 through the early part of 1955 when petitioner was in the business of selling freezers many of its sales were made upon the installment basis and were evidenced by installment obligations. In order to finance this business, petitioner sold these installment obligations to a finance company which withheld as a dealer's reserve a portion of the purchase price pending the complete payment to it of these obligations. Petitioner's income tax returns for the fiscal years 1955 through 1958 show the following dealer's reserve balances: Fiscal Year Ended
Amount
February 28, 1955
$25,789.16
February 29, 1956
21,585.66
February 28, 1957
0
February 28, 1958
0
*340 Opinion The first issue for decision is whether respondent was correct in allocating to petitioner, pursuant to section 482, [4] Fomco's taxable income (exclusive of a deduction for a net operating loss carryover) for the fiscal year ended June 30, 1958. The purpose of section 482 is to prevent the evasion of taxes by the shifting of profits, the making of fictitious sales, and other methods usually used to "milk" a taxable entity. H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16, 17 (1928), 1939-1 C.B. (Part 2) 395; *341 S. Rept. No. 960, 70th Cong., 1st Sess., p. 24 (1928), 1939-1 C.B. (Part 2) 426; Ballentine Motor Co., 39 T.C. 348, 357 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963); Seminole Flavor Co., 4 T.C. 1215, 1228 (1945). The Commissioner will exercise his discretion under section 482 to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer and, in so doing, will apply the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(b)(1), Income Tax Regs.
Upon an examination of section 482 and the decisions in point, we conclude that before the Commissioner may properly make any allocation pursuant to section 482, there must be present two fundamental elements or conditions.[5] *343 These are (1) that the organizations or businesses involved be controlled by the same interests (see section 482; Forcum-James Co., 7 T.C. 1195, 1215, 1216 (1946); Cedar Valley Distillery, Inc., 16 T.C. 870, 876 (1951); and Grenada Industries, Inc., 17 T.C. 231, 253-254 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953)), and (2) that income or expense which is allocated not be attributable to the activities *342 or efforts of the entity which reported it, but be attributable to the activities of the entity to which it is allocated. See Grenada Industries, Inc., supra, at pp. 252, 255-259; Forcum-James Co., supra, at pp. 1214, 1216; Campbell County State Bank, Inc., 37 T.C. 430, 443 (1961), reversed on other grounds 311 F. 2d 374 (C.A. 8, 1963); Miles-Conley Co., 10 T.C. 754, 761 (1948), affd. 173 F. 2d 958 (C.A. 4, 1949); Buffalo Meter Co., 10 T.C. 83, 89 (1948). There is a third element sometimes relied upon by the courts, namely, that the use of separate entities for the conduct of the business or business involved have a business purpose rather than a tax avoidance or tax minimization purpose; Ballentine Motor Co., supra, at pp. 358, 360-361; Commissioner v. Chelsea Products 197 F. 2d 620, 622 (C.A. 3, 1952), affirming 16 T.C. 840 (1951). Cf. Miles-Conley Co., supra, at pp. 763, 764, and Estate of Julius I. Byrne, 16 T.C. 1234, 1243 (1951). It is our opinion that all three elements or conditions were present in the instant case. As for the element of control, since Shabouh owned all of the outstanding stock (except two qualifying shares) in petitioner and 82.5 percent of the outstanding stock in Fomco at all times relevant to this proceeding, it is clear that the control requisite for the application of section 482 was present. As to whether the income allocated by respondent can be characterized as attributable to the activities or efforts of Fomco, we are of the opinion that, although Fomco was a separate entity, it performed no function in connection with the packing of carrots and earned none of the income reported by it for its fiscal year ended June 30, 1958. The record indicates that at all times relevant hereto the material factors necessary for the production of income in the carrot-packing operation involved herein were petitioner's *344 credit standing and working capital, its good will and patronage (acquired when it took over Proprietorship's business), its extensive carrot-packing equipment and the sales manager's services. The record further indicates that both prior to and subsequent to the July 1, 1957 packing contract all of these income-producing factors belonged to and were utilized by petitioner and not Fomco in connection with the packing of carrots for the period in question. Forcum-James Co., supra, at pp. 1214, 1216; Ballentine Motor Co., supra, at p. 360. Cf. Miles-Conley Co., supra, where the income-producing factors belonged to and were utilized by the entity which reported the income. As for the matter of credit standing, petitioner admits that Fomco lacked the necessary credit standing to engage in the carrot-packing business and had to rely on that of petitioner. Furthermore, the record indicates that Fomco, at all times relevant hereto, lacked adequate working capital with which to engage in the packing business. The accounts receivable of $85,194.63 and inventory of $37,216.56 listed on Fomco's balance sheet as of June 30, 1958, appear to us to be no more than bookkeeping transfers between *345 petitioner and Fomco. As for the goodwill and patronage factor, at all times relevant to this proceeding both petitioner and Fomco were known to the general public as Pacific Growers Marketing Company. Thus, it appears that from June 1, 1956, to June 30, 1958, at least, the goodwill and patronage attaching to the name "Pacific Growers Marketing Company," which petitioner obtained in connection with its acquisition of Proprietorship's business, were availed of in connection with the carrot-packing operation. With respect to the sales manager's services, in our opinion these services should be regarded as furnished by petitioner and not by Fomco. At all times relevant to this proceeding, George took charge of and supervised the carrot-packing operations described herein. It was not until December 21, 1957, that George became employed by Fomco, and even at that time he did not realize that Fomco was to function as petitioner's packer. It was not until sometime in 1958, at least six months or more after Fomco had agreed with petitioner to furnish the packing services, that George first learned that there was a packing agreement in existence between petitioner and Fomco. The matter of Fomco's *346 employment of George seems to us an afterhought to "button-up" Shabouh's attempt to bring Fomco, with its net operating loss carryover, into petitioner's produce business. Moreover, as for the matter of packing equipment, it is clear that Fomco lacked the necessary equipment. Consequently, petitioner's extensive packing equipment was used to pack the carrots which Fomco had, by the July 1, 1957, packing contract, agreed to pack. Petitioner contends that Fomco leased the packing equipment from petitioner. However, we are not persuaded by petitioner's contention that 60 cents per 48 -1 lb. crate (the difference between the packing price of $1.75 per 48 -1 lb. crate, agreed upon by petitioner and Fomco in their contract of July 1, 1957, and the $2.35 per 48- 1 lb. crate, which petitioner claims was the standard packing rate in existence during the period involved herein) represents rent paid by Fomco to petitioner for the use of said equipment. Petitioner has not satisfied the burden of proof that 60 cents per 48- 1 lb. crate was the fair rental value of petitioner's packing machinery for the period in question. Moreover, the testimony as to the existence of such a lease is sketchy at *347 best. Shabouh testified that he thought there was a lease agreement between petitioner and Fomco. When reminded on cross examination that no such lease had been offered in evidence, Shabouh testified that the lease might have been oral. The record is barren as to any of the terms of this alleged lease. Petitioner's income tax return for the fiscal year ended February 28, 1958, moreover, lists no rental income. Thus, petitioner has clearly failed to prove that Fomco leased petitioner's packing equipment. Fomco brought nothing to the carrot-packing operation which was not already there by virtue of the assets and efforts of petitioner. It performed no function in the packing operation and in no way can be said to have earned the income received by it from petitioner, allegedly in consideration for packing services. Thus, even if we were to assume, which we do not, that petitioner had established $1.75 per 48- 1 lb. crate as equivalent to the price strangers, in arm's length negotiating, would agree upon as a fair consideration for packing services comparable to those involved herein, nevertheless, under the circumstances of this case, allocation pursuant to section 482 would be necessary. *348 For in view of the fact that Fomco performed no service in connection with the carrot-packing operations, any amount received by it would be in excess of an arm's length price. Forcum-James Co., supra, at p. 1216. Petitioner, in fact, concedes (1) that the same carrot-packing equipment, employees and packing plant location as used by petitioner prior to July 1, 1957, continued to be used in the carrot-packing operation subsequent to that date; and (2) that after July 1, 1957, until February 28, 1958, petitioner continued to pay all of the expenses incurred in connection with the carrot-packing operation, including the wages of the employees used in the carrot-packing operation, and the taxes due thereon under the Federal Unemployment Taxing Act and Federal Insurance Contributions Act. Petitioner, not only on brief but also throughout the record, has urged this Court to give effect to the terms of the July 1, 1957, packing contract wherein petitioner contracted out the carrot-packing job to Fomco and agreed to pay, as Fomco's agent, all of the expenses incurred by Fomco in connection therewith. In regard to this contention, we make reference to the October 1956 contracts and will *349 give the July 1, 1957, packing contract the same effect which petitioner and Fomco gave, vis-a-vis each other, to the October 1956 contracts. By virtue of these contracts Fomco acquired an interest in some carrots which it agreed to pack and sell. Fomco hired petitioner to pack these carrots. On its income tax return for the fiscal year ended June 30, 1957, Fomco reported no items of income or expense relating to this venture, even though it was clearly required to incur expenses pursuant to these contracts. Moreover, petitioner admits that Fomco did not participate in the produce business until July 1, 1957. Fomco never performed any of the rights it acquired or the obligations it had assumed under the October 1956 contracts. These rights and obligations were, in fact, exercised and performed by petitioner although the contracts provided otherwise. It is evident that petitioner and Fomco disregarded these contracts, vis-a-vis each other. We, therefore, disregard the July 1, 1957 packing contract. As for the third element, namely, business purpose, sometimes considered by the courts in cases involving section 482 allocations, it is our conclusion that the motivating factor in the atempt *350 to use Fomco in petitioner's carrot-packing and marketing operation was to make use of Fomco's tax loss carryover. We were not persuaded by Shabouh's testimony that the threat of product liability arising from product liability agreements, which packers and marketers of produce were sometimes required to execute, was the reason for separating the carrot-packing function from the other parts of the business. First of all, petitioner items of income or expense relating to this venture, even though it was clearly required to incur expenses pursuant to these contracts. Moreover, petitioner admits that Fomco did not participate in the produce business until July 1, 1957. Fomco never performed any of the rights it acquired or the obligations it had assumed under the October 1956 contracts. These rights and obligations were, in fact, exercised and performed by petitioner although the contracts provided otherwise. It is evident that petitioner and Fomco disregarded these contracts, vis-a-vis each other. We, therefore, disregard the July 1, 1957 packing contract. As for the third element, namely, business purpose, sometimes considered by the courts in cases involving section 482 allocations, *351 it is our conclusion that the motivating factor in the atempt to use Fomco in petitioner's carrot-packing and marketing operation was to make use of Fomco's tax loss carryover. We were not persuaded by Shabouh's testimony that the threat of product liability arising from product liability agreements, which packers and marketers of produce were sometimes required to execute, was the reason for separating the carrot-packing function from the other parts of the business. First of all, petitioner was unable to produce evidence of any such agreement executed either by it or Fomco. Moreover, no evidence was presented that sufficient product liability insurance was not obtainable by petitioner. Nor did petitioner offer any evidence to indicate that the substantial deductions for insurance premiums reported on its income tax returns for the fiscal years ended February 28, 1957 and 1958, did not relate to product liability insurance. Furthermore, since the assets listed on Fomco's books, aside from those transferred to it by petitioner, were scant, the transfer of the packing function to Fomco would seem to offer little protection to petitioner in the event any product liability were asserted *352 against the business. Our conclusion as to the lack of a business purpose is further buttressed by the fact that when Fomco's net operating loss carryover had been exhausted, the packing function, as well as the other phases of the produce business, was transferred to a new corporation. Testimony was offered on behalf of petitioner that the transfer was effected because requested by a potential buyer of a one-third interest in the business. However, no evidence of the terms of any such sale was presented. Moreover, no such sale was ever made to this individual or anyone else. Petitioner's explanation of the transfer of the produce business to the new corporation is entirely lacking in proof. The petitioner finally contends that what the respondent has done is not to "distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among [controlled organizations]," but to consolidate the net income of Fomco with that reported by petitioner. [6] Petitioner argues that section 482 does not permit such combining or consolidating of the net income of two related taxpayers and cites section 1.482-1(b) of the Income Tax Regulations and Chelsea Products Inc., 16 T.C. 840 (1951), *353 affd. 197 F. 2d 620 (C.A. 3, 1952); Cedar Valley Distillery, Inc., supra, at p. 876; Estate of Julius I. Byrne, supra; and Palm Beach Aero Corporation, 17 T.C. 1169 (1952). This argument must fail because the allocation effected by respondent did not produce a result equivalent to the filing of consolidated returns by petitioner and Fomco. Respondent did not allocate to petitioner Fomco's taxable income. In effect, respondent allocated all of Fomco's gross income and deductions except the deduction for its net operating loss carryover. Fomco's net operating loss carryover deduction would have been reflected in the taxable income of petitioner and Fomco if they could have filed consolidated returns.[7] Thus, respondent's allocation did not produce a result equivalent to consolidating the returns of petitioner and Fomco. Moreover, this Court has taken the position that in certain circumstances net income, under section 45 of the 1939 Code, and taxable income, under section 482, may properly be allocated. Ballentine Motor Co., supra, at pp. 357, 358. See also Advance Machinery Exch. v. Commissioner, 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court, certiorari *354 denied 344 U.S. 835 (1952). We conclude, in view of all the surrounding circumstances, that the substance of this entire transaction was to shift income, which in fact had been earned by petitioner, to Fomco so that it could be offset by Fomco's net operating loss carry forward. Ballentine Motor Co., supra. We, therefore, hold that respondent was correct in allocating to petitioner, pursuant to section 482, the earnings shifted to Fomco. The second issue for decision [8] is whether petitioner is entitled to a bad debt deduction for any fiscal year affecting its net operating loss carryover for its fiscal year ended February 28, 1958, in an amount equivalent to the dealer's reserve of $21,585.66 shown on its income tax return for the year ended February 29, 1956. Petitioner in its brief and reply brief seems to assume the burden is on respondent to refute petitioner's claim. Petitioner clearly has the burden of proving it is entitled to a bad debt deduction. In order *355 to do so, it must proffer convincing evidence as to the worthlessness of the debt and the year in which the debt became worthless. H. W. Findley, 25 T.C. 311 (1955), affd. per curiam, 236 F. 2d 959 (C.A. 3, 1956); Western Products Co., 28 T.C. 1196, 1221-1222 (1957); Denver & Rio Grande Western Railroad Co., 32 T.C. 43, 56 (1959), affd., 279 F. 2d 368 (C.A. 10, 1960). Petitioner has failed to do this. Because of this failure of evidence, there is no need to consider whether the debt involved was between petitioner and the finance company or petitioner and the finance company or petitioner and the freezer purchasers who executed the customers' paper. Cf. Mike Persia Chevrolet, Inc., 41 T.C. - (November 15, 1963); Wilkins Pontiac, 34 T.C. 1065 (1960), reversed, 298 F. 2d 893 (C.A. 9, 1961); and Foster Frosty Foods, Inc., 39 T.C. 772 (1963), on appeal (C.A. 10, June 28, 1963).
Decision will *356 be entered under Rule 50. Footnotes
1. Respondent at the trial conceded an issue involving the allowability to petitioner of a net operating loss carryover deduction. ↩
2. Unless otherwise indicated, all section references will be to the Internal Revenue Code of 1954.↩
3. The 48-1 lb. crate is a crate containing forty-eight 1 lb. bags of carrots. It is the predominant size in the business.↩
4. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.↩
5. This is in addition to any procedural steps that the Commissioner may be required to follow. Cf. Commissioner v. Chelsea Products 197 F. 2d 620(C.A. 3, 1952), affirming 16 T.C. 840 (1951); Ballentine Motor Co., 39 T.C. 348, 358 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963); and Aldon Homes, Inc., 33 T.C. 582, 608 (1959). We note that with regard to the deficiency notice involved in this proceeding the respondent did give petitioner notice that he was relying upon sec. 482↩ as authority for the allocation made by him.
6. By the term "net income" it is assumed that petitioner means taxable income as defined in in sec. 63. ↩
7. Petitioner and Fomco did not have a common parent and thus were not entitled to file a consolidated return, Sec. 1504.↩
8. Petitioner, on brief, conceded respondent's determination that its net operating loss carryover for the fiscal year ended February 28, 1958, should be reduced on account of the inclusion of certain dealer's reserves in petitioner's income for years prior to that involved in this proceeding.↩